679 So.2d 527 (1996)
Donald S. HICKMAN, Plaintiff-Appellee,
v.
EXIDE, INC., et al., Defendants-Appellants.
No. 28495-CA.
Court of Appeal of Louisiana, Second Circuit.
August 21, 1996.
*529 Davenport, Files & Kelly by Michael J. Fontenot, for Defendant-Appellant.
Nordyke & Denlinger by Keith B. Nordyke, for Plaintiff-Appellee.
Before MARVIN, NORRIS and CARAWAY, JJ.
NORRIS, Judge.
This is a products liability case involving a car battery that exploded in Donald Hickman's face. The manufacturer of the battery, Exide Corporation, appeals a judgment finding the battery defective by design, allocating 10% comparative fault to the plaintiff, and awarding general and special damages of $424,115.65 (subject to reduction by 10%). Each of Exide's six assignments of error asserts a factual claim which is subject to manifest error rule of Rosell v. ESCO, 549 So.2d 840 (La.1989). For the reasons expressed, we affirm.

Factual statement
This case was tried over three days in January 1994, after which the District Court prepared excellent written reasons for judgment. We reproduce his recital of the facts and adopt them as our own:
Factual background
Donald Hickman, born in 1944, was residing on Pecan Street, Bastrop, Louisiana in the summer of 1988. At that time he was convalescing from lumbar surgery performed by Dr. Bruce Razza in April of 1988, following a work-related accident. Plaintiff's twin brother Ronald lived across the street from Donald Hickman in Bastrop. The plaintiff's son, Randall Hickman, also sometimes known as Randall Newton, was living with defendant Kenny Hickman, Ronald Hickman's son, at an apartment in Bastrop. Both of the younger *530 Hickmans were working on a tugboat on the Mississippi River.
In early summer 1988, Ronald Hickman sold a 1964 Chevrolet Impala to his son Kenny. The battery that came with the car at the time of the sale was apparently old and required periodic jumping. Several days before the accident Kenny Hickman purchased a new Exide Centura 100 battery from the Otasco store in Bastrop. The new battery was installed by an Otasco employee on [the store's] premises. Neither Kenny Hickman nor Randall Hickman paid much attention to the process of the removal of the old battery or the installation of the new one. The automobile operated properly following installation of the new battery up until the date of plaintiff's accident.
On the afternoon of August 23, 1988, which was at a time in between boat hitches for Kenny and Randall Hickman, the younger Hickmans went to visit Ronald Hickman. In doing so, they parked their car in the plaintiff's driveway directly across the street from Ronald's house. The young men walked across the street and knocked on Ronald Hickman's door, but finding no one at home, returned to the car. The car would not start because the engine would not turn over. After several minutes of unsuccessful effort to get the car started, Randall sought help from his father Donald. After a preliminary inquiry as to what the problem was, Donald Hickman grabbed a pair of pliers from his kitchen and went outside to help his son and nephew. Although the testimony is not completely clear on this point, the hood was apparently already up by the time plaintiff gingerly made his way out the front door into the driveway.
After talking with both Randall and Kenny, plaintiff assumed that the problem was more than likely a loose ground wire on the new battery. While [plaintiff was] standing in front of the engine compartment and peering in at the battery, which was located on the front passenger side of the car, and without touching anything within the compartment, the battery exploded in Donald Hickman's face. The evidence preponderates that at the time Donald Hickman leaned down and under the hood to inspect the battery, at that precise moment Kenny Hickman turned the key, thus creating a spark which ignited the explosion.
The thrust of the explosion caused plaintiff to fall backwards sharply. Battery acid was splashed into Donald's eyes and face. Plaintiff did not fall onto the ground, but was caught by his son Randall.
A neighbor, Sandra Rogers[,] lived about two doors down from plaintiff and was standing in her carport when she heard the loud noise and plaintiff's exclamation. As it happened, she was employed as a nurse for Bastrop ophthalmologist Dr. Robert McCue. She had a topical anesthetic in her purse and immediately applied the same to the plaintiff's eyes. Donald Hickman was later taken to the Morehouse General Hospital Emergency Room, and was admitted at approximately 8:50 o'clock p.m.
Randall Newton's deposition, taken on September 14, 1989, was admitted in lieu of his live testimony, as his whereabouts were apparently not known as of the date of trial. Randall Newton testified that the plaintiff handed him (Randall) the pliers back before Donald ever had a chance to use them. Randall believed that his father was going to reach inside the engine compartment to find the ground wire that was loose, but that before he got to the ground wire, the battery blew up in his face. Randall Newton further testified that the battery blew up and his father grabbed his face and fell back whereupon he was caught by Randall.
Randall Newton further testified that the battery had both vent caps on it before the explosion occurred; however, he noticed that the battery was missing the right side vent caps following the explosion. Randall further observed a split in the right top side of the battery. No one touched the battery following installation at Otasco up until the time of the explosion, according to Randall Newton. Randall further ruled out the possibility of anyone smoking a cigarette or having an open flame anywhere around the battery. *531 Randall conceded that there was some frustration exhibited by Kenny Hickman, in the form of cursing the battery, when it was discovered that the automobile would not start, since the battery was only a few days old. Randall Hickman denied that either he or his father used any type of tool upon the battery prior to the explosion.
Randall Newton also testified about finding a white vent cap out in the yard approximately 15 feet from the automobile after the explosion. He assumed that it belonged to the battery but wasn't really certain. He further testified that although they looked diligently, they were unable [ever to] find the red vent cap which came with the battery upon installation. Finally, Randall Newton testified that Kenny Hickman never got out from behind the wheel during the time that the hood was raised and preliminary efforts were made to determine what was wrong with the automobile.
Defendant Kenny Hickman testified at trial that he never took either of the vent caps off of the battery and that the car had started properly up until the time that it went dead in the driveway. Kenny admitted being angry because the battery was only four days old. He confirmed that Donald Hickman was carrying a pair of pliers in his hand and stated that no one was smoking a cigarette at the time of the explosion. After Donald Hickman had been standing in front of the engine compartment for a minute or so, Kenny Hickman turned the key in the ignition, whereupon he heard what he described as the sound of a milk carton being blown up. Kenny then jumped out of the car, around to the front and saw his cousin Randy holding up the plaintiff who was holding his eyes.
Kenny Hickman recalled the assistance given Donald Hickman by Ms. Rogers. During the time she was attending the plaintiff, Kenny and Randall observed the battery again and saw battery acid everywhere under the hood. Kenny testified that Randall took the battery out of the car later during the day and they had to loosen the cables in order to get it out of the engine compartment. The original vent cap on the battery was never found although Kenny testified that Randall found the white vent cap somewhere in the yard. Kenny affirmatively testified that no one touched the battery after installation or before the explosion.
Donald Hickman's testimony
Plaintiff testified that he had hurt his back in 1986 while working at the International Paper Mill in Bastrop. Plaintiff had a long history of various manual labor jobs following his discharge from the Army in 1966 at age 21. Among these jobs included working as a pipefitter apprentice, a pipe welder, a firefighter for the City of Bastrop, a police officer in Oak Grove and a construction foreman for BE & K.
The surgery performed for the work-related injury took place in April of 1988 by Metairie orthopedist Dr. Bruce Razza. Part of the regime of plaintiff's recovery was a walking program to control his weight. In doing so, plaintiff got down to approximately 165 pounds. In June of 1988, plaintiff saw a Dr. Ransom who was covering for Dr. Razza. On this visit he reported severe pain stemming from a fall that had occurred while walking. By mid-August 1988, plaintiff's back pain was increasing but the walking would alleviate some of his pain symptoms.
On the date of the accident, plaintiff, his wife and stepdaughter were inside his home * * * when they heard a vehicle pull up in the driveway. Donald Hickman testified that Randy knocked on the door and asked for help getting the car started. Plaintiff, who was wearing a back brace at the time, reached for his walking cane and reflexively grabbed a pair of pliers. Donald Hickman believed that the hood was already raised by the time he had gotten to the car. Donald Hickman assumed that the problem might be a loose ground wire and advised both Kenny and Randall of that suggestion. He handed the pliers to Randall Hickman and put his left hand on the frame of the car. He then leaned in and as he was reaching for the ground *532 cable, he heard a "poof" sound and recalls only being snapped backwards violently.
Plaintiff's recall of the following events is hazy but [he] believes that battery acid went up his nose and into his eyes and mouth. Plaintiff had no recollection of visiting the Morehouse General Hospital Emergency Room the same day; rather, his first recall is the visit to Dr. McCue's office. However, it should be noted that plaintiff testified at trial that on the date he was injured, he felt something "give" in his back.
Plaintiff lost his sight for a little over a week following the accident. On the eighth day after the explosion, plaintiff's sight began to return and as of the day of trial plaintiff testified that his eyes were pretty much back to normal except for excessive dryness. Plaintiff also testified as to a bad sinus problem occasioned by the accident, testifying specifically about a "dead odor" within his nasal cavity that manifested itself some four to five days after the accident.
The plaintiff was subsequently referred to a local otolaryngologist[,] Dr. Larry Danna. He found that plaintiff's sinuses were totally stopped up. Dr. Danna recommended and later performed surgery on both sides of the plaintiff's nasal cavity. Dr. Danna also treated the plaintiff for tinnitus, which is a continuous steady ringing sound in the ears. * * *
On cross-examination, Donald Hickman testified that "all he could see was red" when looking at the battery. He further testified that he saw no vent holes. He later learned from someone that the explosion had blown off one of the vent caps. Donald Hickman testified that he never read any battery warnings before the accident because he was not looking for a warning and was not expecting the battery to blow up. Donald Hickman testified that the battery explosion set him back a good bit in his recovery from the first back surgery. He also testified as to numerous post-accident falls and to his present back condition.
The Battery
The battery that is the subject of this lawsuit was manufactured by Exide at one of its plants in Salina, Kansas on or about July 6, 1988. The particular battery type is known as a group 24, red-topped wet battery. Exide commands a considerable share of the world replacement battery market, building in excess of 20 million batteries a year at its various plants. The Exide battery uses a gang vent system which consists of three vent plugs on a single strip for insertion into the female wells of the battery. The battery contains six female wells with each gang strip containing three plugs. Automobile batteries produce hydrogen gas when current is applied as in the process of a battery being charged or when it is in normal operation. When combined with air or oxygen, hydrogen becomes highly explosive. In order to prevent hydrogen from accumulating and exploding, a battery design must provide for the venting of hydrogen. All batteries except maintenance free batteries need holes for the periodic addition of electrolyte which is a solution of water and sulfuric acid. It is not uncommon for a battery to explode when a spark comes into contact with hydrogen and air in sufficient quantities and with sufficient confinement.
The area immediately beneath the cover of the battery is called the ullage space. Gas may accumulate in this area. If a spark enters the ullage area in the presence of hydrogen[,] an explosion can and may result. The vent systems are supposed to prevent sparks from entering the ullage area by venting the gas out of the battery through a hole that is too small for a flame to pass through and by venting the gas through a fritt which is a microporous structure designed to allow gas to escape but to prevent flames from entering.
Expert testimony
As would be expected in a complex products liability case of this nature, a substantial portion of the trial was devoted to the presentation of expert testimony. Testifying on behalf of the plaintiff was Dean Jacobson, Ph.D., an experienced university *533 professor and principal of a consulting firm known as Forensic Engineering Inc. Dr. Jacobson's impressive curriculum vitae is found in the record as plaintiff's Exhibit 10. Dr. Jacobson obtained a Ph.D. at UCLA in 1969 and is currently employed as the director of the Science and Engineering of Materials Ph.D. program at Arizona State University, where he holds a full professorship. Dr. Jacobson was accepted by the court as an expert in the fields of failure analysis, battery explosions, fracture analysis, thermodynamics and materials science. He has previously been accepted as an expert in failure analysis dealing with exploding batteries in state courts in California, South Carolina and Missouri. He has conducted extensive and ongoing research in his various fields of expertise and has had over 100 scholarly papers published in his post-graduate career.
Prior to * * * giving testimony about the various scientific tests performed upon the subject battery, Dr. Jacobson gave useful testimony as to the structure and composition of wet batteries in general, describing the configuration of plates within the battery itself, voltage, composition of the electrolyte and the nature of the gases that are created from the electrolyte solution. Dr. Jacobson described the task for which he was retained by counsel for plaintiff as to examine the subject battery, to inspect it and render an expert opinion about the battery. When he undertook the engagement, Dr. Jacobson was forwarded the battery, several photographs taken of the battery following the explosion and the discovery depositions of the plaintiff, Kenny Hickman and Randy Newton. Dr. Jacobson's battery test protocol was entered into evidence as Exhibit "P-99" and discussion thereof is not essential for this case but is indicative of the scientific methodology employed by Dr. Jacobson in rendering his consultative service to the plaintiff.
The better part of one full day of trial was spent with Dr. Jacobson on the witness stand. Dr. Jacobson's testimony, which was often technical and arcane, was accompanied by the identification of numerous photographs, all of which were received into evidence and marked accordingly. The first series of photographs, Exhibits 11 through 13, were photographs taken shortly after the explosion * * *. Exhibits 20 and 21 depict the crack that Dr. Jacobson believes was caused by the explosion. He testified as to incidences of blushing, characterized by speckles of white on the red edges of the cracking area. Dr. Jacobson also testified as to the characteristics of product fracture as opposed to being cut purposely[, and] as to the phenomenon known as "hackling" which is indicative of an explosive rupture. The hackling characteristic was especially evident in Exhibit 35.
By contrast, photographs 31 through 34 show a partial dissection of the battery through the use of a cutting tool, a motorized silicon carbide wheel. Dr. Jacobson concluded that the fracture shown on the cover and the distortion of the inner cell walls within the battery showed strong evidence of an explosion such as related by Donald Hickman. Dr. Jacobson, who has performed a number of battery explosions over the years under controlled conditions, testified as to being able to observe through high speed photography a flame front "walking" from one cell to the other, that is, a rapid movement of a flame front within the battery itself. Dr. Jacobson believes that Exhibit 34 shows this phenomenon, as it is his opinion that the explosion started in cell # 2.
Dr. Jacobson closely examined the two battery terminals and concluded that the marks shown in Exhibits 37 and 38 were probably caused by the use of channel-lock pliers and that this marking occurred after the explosion. The photographs depicted in Exhibits 39 through 43 are photos of the vent cap marked "Poison." Dr. Jacobson opined that there was nothing to indicate that this vent cap was in any way involved in the explosion. Dr. Jacobson also concluded that the negative post to the battery was not involved in the explosion itself and that any damage shown thereon occurred after the explosion.

*534 A considerable amount of testimony was adduced by Dr. Jacobson concerning several tests that he performed upon an exemplar of the Exide Centura battery. Dr. Jacobson testified that one of the purposes of performing testing on the exemplar batteries would be to determine the capability of the battery to generate pressure and specifically to see if a battery would explode with both vent caps on the battery as he has theorized for the Hickman battery. These various tests are depicted in Exhibits 49 through 92, both numbers inclusive, and show photographs as well as computations and results of the various testing.
Following a description of the various tests, Dr. Jacobson concluded that dangerous gas was escaping between the gang vent plug and the gang vent hole because there was an insufficiently tight seal between the two. Dr. Jacobson contends that because one of the primary objectives of a flame arresting device is to prevent the traveling of any type of parallel path for a flame front, the propensity of the Exide Centura battery to leak gas proved its defectiveness.
Dr. Jacobson discussed in detail the modern battery technology[,] showing that there are available alternative designs for vent caps which prevent the possibility of a parallel path being created. For example, plaintiff's Exhibits 58 through 60 show a design of a Japanese battery which uses screw-down plugs with gaskets, forming a much tighter seal than the gang vent plug system in the Exide battery. Dr. Jacobson stated that this technology was available in 1988 and was in fact being used before the gang vent technology came into common usage. Exhibits 84 through 89 are various measurements showing the relative roundness of the vent holes on the battery exemplar. These exhibits show deviations in roundness between the hole and the plug fitting into the hole, resulting in gaps of varying dimensions, the result of which could be the escape of hydrogen gas from the battery. Dr. Jacobson testified that the deviations were significant enough that a flame could easily "walk" from one vent hole to the next.
Dr. Jacobson concluded that at the time Donald Hickman suffered his injury, both vent caps were on the Exide battery. He came to this conclusion, which is disputed by Exide, because of observable damage on the battery cover including fractures, cracks and the presence of hackling. Having made that assumption, Dr. Jacobson believes that the explosion was caused by the presence of a flame front from an external spark and that the flame front was caused by the escape of hydrogen gas which blew the cap off and created the explosion. Further, Dr. Jacobson believes that the precise cause of the explosion was the flame front getting into the ullage space. Dr. Jacobson was critical of the vent cap system as a whole, as well as the easy reversibility of the vent caps. He was likewise critical of the microporous fritt and the concavity of the surface of the gang vent system which would allow gases to accumulate underneath the cap. Finally, Dr. Jacobson testified that the battery was in normal and proper use at the time of the explosion.
On cross-examination, Dr. Jacobson was grilled extensively as to the type of testing performed and as to his personal preference for the individual screw-down gasket vent cap rather than the gang vent system. Dr. Jacobson opined that the technology utilized by Exide in the battery shown in Exhibit # 61 was better still than the screw-down method of closure utilized in the Japanese battery. Dr. Jacobson also testified at length about the so called "maintenance-free" battery which does not require the periodic adding of electrolyte. Dr. Jacobson stated that he had never heard of a maintenance-free battery blowing up in anyone's face. Dr. Jacobson did concede that the incomplete, partial vent cap found in the Hickman yard would not have been a sufficient flame arrester, if it had in fact been in place over the three cells near the negative terminal at the time the explosion occurred. However, Dr. Jacobson held fast to his opinion that he believes the original Exide vent cap was in place at the time of the explosion. In support of this proposition, Dr. Jacobson concluded, with justification, that there *535 would be no reason for a consumer to touch or tamper with a battery that had been purchased only four to five days before, especially when the car had been operating properly. No evidence indicated that the battery had been misused in any way prior to the explosion or that there was anything to indicate that the Hickman vehicle was defective in any other manner.
On re-direct, Dr. Jacobson stated that it would be extremely expensive, perhaps costing as much as $10,000.00, to perform a truly simulated explosion upon a battery exemplar. Dr. Jacobson stood by his testing as defensible in the scientific community and emphasized that one of the purposes of the testing with helium gas was to show the incomplete sealing with the plastic plugs on the gang vent strip system.
Testifying for Exide in an expert capacity was Gene Rutkowski [sic; his name appears to be "Rutkoski"], a consulting engineer who owns a company called Reading Technical Services. Rutkoski had a concentration in metallurgy which he studied at the Colorado School of Mines. He later obtained an MBA at the University of Denver. He has approximately 20 years experience in the battery industry, having worked for General Battery for some 10 years. This company was later absorbed into Exide. Mr. Rutkoski ran the technical center at General Battery and tested in various ways over 2,000 batteries per year. Although Mr. Rutkoski had taken several short courses in products liability and failure analysis, especially dealing with strength of materials, his scientific expertise is far inferior to that of Dr. Jacobson. Nonetheless, the court accepted Mr. Rutkoski in a general field of lead-based batteries. Mr. Rutkoski generally agreed with Dr. Jacobson on the principles of the battery and vent cap system and went into some detail himself in describing the vent cap construction process. Customarily, batteries are shipped out of the Salina, Kansas plant with both vent caps installed thereon. Mr. Rutkoski believes that both vent caps were on the Hickman battery when installed by Otasco.
Mr. Rutkoski did not think that both vent caps were on the battery at the time of the explosion because of what he termed as very slight damage to the battery itself. He felt that there would be a much more violent explosion if the hydrogen gas were confined by both vent caps. Mr. Rutkoski likewise found no internal source to the explosion, thereby of necessity the explosion must have been from an external source. Mr. Rutkoski's testimony differed markedly from Dr. Jacobson's in that Rutkoski believes that the incomplete vent cap cover found in the yard by Kenny Hickman several days after the accident had actually been on the battery at the time of the explosion. He based this conclusion on what were termed as "witness marks," * * * caused by moisture on the surface combining with particulate matter. Mr. Rutkoski testified under cross-examination that Exide had performed no testing to replicate any of Dr. Jacobson's several tests.
Also testifying was Ray Musgrove, presently director of consulting engineering at Exide. As such, he is involved in general consulting for the company which involves designing, manufacturing and applications of batteries. Mr. Musgrove has some 42 years experience in the battery business working for various manufacturers. Mr. Musgrove received a bachelor's degree in general science from the University of Manchester, England in 1949. Mr. Musgrove's expertise has primarily been hands-on experience with various battery manufacturing companies in England and the United States. He has been involved in the testing of the design of a product and has seen numerous automobile batteries explode. Mr. Musgrove has in fact designed a venting system about two years ago for Exide and has testified as a battery expert in court on approximately four other occasions. Heavily involved in the manufacturing of batteries for Exide, Mr. Musgrove is considered the design engineer for the company but has no engineering degree nor any graduate degrees for that matter. He has never published or written in his field. The court accepted Mr. Musgrove as an expert in the general field of lead acid batteries.

*536 After describing the purpose of the venting system * * * as a sure-fit "fritt," Mr. Musgrove stated that the purpose of the vent caps was two-fold, to-wit: "to stop egress of the liquid electrolyte and to provide for the discharge of gases in a safe manner." Concluding that Dr. Jacobson's various testing procedures were immaterial and irrelevant to the integrity of the vent cap, Mr. Musgrove testified that Exide chose not to test it themselves. Mr. Musgrove defended the integrity of the gang vent system and contended that every part of the battery is part of the flame arresting system[,] including the barrels on the vent cap itself.
On cross-examination, Mr. Musgrove conceded that there may be a parallel path through which gas may escape and admitted that he had seen gas burning beneath the vent cap cover on occasion. Finally, while conceding that Exide had done no replication of testing or opposition testing to try to refute the conclusions that Dr. Jacobson had made, Mr. Musgrove simply dismissed Dr. Jacobson's entire testing methodology as "junk science."

Action of the District Court
The District Court initially noted that this accident occurred on August 23, 1988, only a week before the effective date of the Louisiana Products Liability Act,[1] thus bringing it under the jurisprudence of Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). Under Halphen the plaintiff in a products liability case against the manufacturer must prove "that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control." Id., at 113. Halphen held that a product could be defective by design in three ways: (1) a reasonable person would conclude that the danger in fact, whether foreseeable or not, outweighed the utility of the product; (2) alternative products were available to serve the same needs or desires with less risk of harm; or (3) there was a feasible way to design the product with less harmful consequences. Id., at 115. Under the pre-Act jurisprudence, the existence of a defect could be inferred from the mere circumstances of the accident, Brown v. Sears, Roebuck & Co., 514 So.2d 439 (La.1987), and the manufacturer was presumed to know of any defects in its product. Philippe v. Browning Arms Co., 395 So.2d 310 (La.1980).
The court also stated that it had assessed the expert testimony in light of Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), concluding that although Exide's experts had deprecated Dr. Jacobson's tests as "junk science," the court found his testing procedures to be well documented and photographed, and lucidly explained in court. The court also found that Exide's experts lacked breadth of expertise in fracture analysis and strength and materials, thus entitling their opinions to "minimal weight."
Applying the law to the facts, the court specifically found there was no evidence that the plaintiff or his son tampered with the battery before it exploded; such was suggested but not proved. The court accepted the plaintiff's evidence that both gang vent caps were in place at the time of the accident.
The court accepted Dr. Jacobson's test results showing that hydrogen gas could leak out of the battery from areas other than the fritt, and that the space around the skirt of the vent cap was big enough to permit a flame to enter. The court also accepted Dr. Jacobson's measurement of the amount of gas that could accumulate under the cap, and that when this gas was ignited it would cause a violent explosion. The court therefore concluded that the Centura 100's vent cap system was defective by design. The court found a further defect in that the cap gave no indication, as by a clicking-lock sound, that it was fully in place, thus permitting the cap to *537 be incompletely fixed to the battery and allowing even more gas to escape. The court therefore concluded that the danger in fact created by the vent cap design clearly outweighed the otherwise high utility of the product.
The court further accepted Dr. Jacobson's testimony that other vent caps, with threaded vent holes and gaskets, prevented the escape of excess flammable gas. Although these were admittedly more expensive, they were not utilized by Exide. Thus the court found, as an additional basis of liability, that an alternative product was available to serve the same need with less risk of harm. The court pretermitted Hickman's contention that it was defective per se.
The court also found that comparative negligence applied to the case. Harper v. State Farm Automobile Ins. Co., 484 So.2d 737 (La.App. 1st Cir.), writ denied 489 So.2d 246 (1986). Discounting Kenny and Randall's view that Hickman was an "old shade-tree mechanic," the court accepted Hickman's own testimony that he did not realize a battery could explode. For his failure to read the warnings on the vent caps, however, the court assessed 10% fault.
The court awarded damages as follows:

A. General damages $200,000.00
B. Actual lost wages 55,627.00
C. Future lost earnings or impairment
 of earning capacity 50,000.00
D. Actual medical expenses 68,488.65
E. Future medical expenses 50,000.00
 TOTAL AWARD $424,115.65

The total was subject to a 10% reduction for Hickman's comparative fault. The elements of the damage award will be discussed in connection with Exide's fifth and sixth assignments of error.

Discussion: Finding of defect
By its first assignment Exide contests the district court's finding that the battery was defective by design. The thrust of the argument is that the court erred in accepting the opinion testimony of Dr. Jacobson over that of Mr. Rutkoski and Mr. Musgrove. Exide further argues that the court cited but misapplied the law of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to fortify its reliance on Dr. Jacobson's opinions, but that if Daubert were properly applied, it would mandate a rejection of Dr. Jacobson's methods and conclusions.
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. La.C.Ev. art. 702. A witness qualified as an expert may testify in the form of an opinion or inference that embraces an ultimate issue to be decided by the trier of fact. La.C.Ev. art. 704. The trier of fact is entitled to assess the credibility and accept the opinion of an expert just as it does with respect to other witnesses, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990); Townsend v. Westinghouse Elevator Corp., 25,966 (La.App. 2d Cir. 8/17/94), 641 So.2d 1022, writ denied 94-2371 (La. 11/29/94), 646 So.2d 403.
The court of appeal may not set aside a finding of fact by a trial court in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Lirette v. State Farm, supra, and citations therein.
In Daubert v. Merrell Dow Pharmaceuticals, supra, the Supreme Court restated the standard of admissibility of expert evidence in federal trials. Prior jurisprudence had required "general acceptance" of a technique in its scientific field before the technique could be considered admissible. See Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (1923). In 1975, however, Congress adopted the Federal Rules of Evidence, after which the Louisiana Code of Evidence is modeled. Daubert, 509 U.S. at 587-89, 113 S.Ct. at 2794; State v. Foret, 628 So.2d 1116, 1121 (La.1993). Finding that the Rules of Evidence sought to "relax the traditional barriers *538 to opinion testimony," and noting that Rule 702 (equivalent to C.E. art. 702) did not mention the "general acceptance" test, the Supreme Court in Daubert replaced that standard with a "gatekeeping" function to assure that "any and all scientific testimony or evidence is not only relevant, but reliable." State v. Foret, supra. The new standard requires "a valid scientific connection to the pertinent inquiry as a precondition to admissibility," and mentioned various relevant factors: whether the technique had been subjected to peer review or publication, its known or potential rate of error, the existence of standards controlling the technique's operation, the technique's "refutability" or "testability," and the general acceptance of the technique in the scientific community. Id., 628 So.2d at 1122, citing Daubert, 509 U.S. at 593-95, 113 S.Ct. at 2797. The Louisiana Supreme Court adopted the Daubert standard in State v. Foret, supra; see also Southern Message Serv., Inc. v. Commercial Union Ins. Co., 26,311 (La.App. 2d Cir. 12/7/94), 647 So.2d 398, writ denied 95-0059 (La. 3/10/95), 650 So.2d 1180.
Exide contends that the district court misapplied Daubert in accepting Dr. Jacobson's expert opinion that the battery was defective. Specifically, it contends that of the 129 publications on his curriculum vitae, not one pertains to batteries or gang vent systems, suggesting an absence of testability and general acceptance of his theories; that Dr. Jacobson could not truly test his theory unless he exploded a battery, which he did not do; and that he did not subject the allegedly safer batteries to the same series of tests to prove they lacked defects similar to those found in the Centura 100.
At the outset we note that at trial, Exide's counsel did not lodge any objection to the admissibility of Dr. Jacobson's testimony, and in fact appears to have stipulated to his expertise. R.p. 623. Thus we are not certain that Exide has properly preserved this issue for appeal. See Bryant v. Tidy Building Serv., 95-2724 (La.App. 4th Cir. 7/3/96), 678 So.2d 48.
Out of abundant caution, however, we have reviewed his testimony under Daubert, supra, and conclude that the District Court could find that Exide did not effectively refute Dr. Jacobson's procedures and results. True, Mr. Musgrove peremptorily described Dr. Jacobson's experiments as "immaterial and irrelevant" and "junk science," but the substance of his testimony did not answer Dr. Jacobson's underlying theories and conclusions. For example, neither Mr. Musgrove nor Mr. Rutkoski denied that Dr. Jacobson's "sniffer" apparatus would detect gas escaping from the battery. Although they criticized the amount of pressurized gas that Dr. Jacobson pumped into the battery exemplar as being "not normal service," Exide's experts did not say it was scientifically wrong to enhance pressure so that system leaks might be more easily detected. Exide's experts also did not contest the accuracy of Dr. Jacobson's coordinate measurements, which showed gaps of over 0.020 inch in various places between the holes and the plugs in the vent caps (hydrogen gas can escape through an aperture only 0.004 inch); rather, Mr. Musgrove testified that the plastic in the plug was flexible enough to fill any discrepancies. In brief, Exide urges that Dr. Jacobson failed to show that a "maintenance-free" battery would be safer than the Centura 100 because he did not subject such a battery to the same tests; however, there is no indication of how to take vent cap/hole coordinate measurements on a battery without vent holes or caps. In short, this record is sufficient to support the court's finding that Dr. Jacobson's tests bear a "valid scientific connection to the pertinent inquiry" and to find his results admissible under Daubert and State v. Foret, supra.
Exide further uses the Daubert factors to challenge the weight of Dr. Jacobson's evidence. We agree with Exide's characterization of the trial as a battle of expert testimony, but we do not see manifest error in the court's decision to accept the opinions of Dr. Jacobson and to reject those of Messrs. Musgrove and Rutkoski. Lirette v. State Farm, supra. In brief Exide raises a litany of complaints about Dr. Jacobson's methods, but all of these were presented to the District Court, either by cross examination of Dr. Jacobson or by testimony of Exide's experts; *539 despite the alleged discrepancies in Dr. Jacobson's theory, the court found his testimony "convincingly demonstrate[s] that the danger in fact created by the design of the battery clearly outweighs the otherwise high utility of the product." We find nothing to render Dr. Jacobson's testimony "patently unsound" or to undermine the court's decision to accept it. Lirette v. State Farm, supra. This assignment lacks merit.

Factual account of the accident
By its second and third assignments, Exide urges the District Court erred in accepting the plaintiff's version of the facts surrounding the explosion, and in giving no consideration to the testimony of a neutral witness, Clifton Rogers. Mr. Rogers testified that he was across the street, mowing his yard, when the accident occurred; just prior to the explosion, he saw people standing around the car, shouting and cursing; somebody (he was not sure who) slung a wrench at something under the hood; and all this led Mr. Rogers to comment to his son, "Watch that crazy SOB blow up that battery in his face." According to Exide, this testimony refutes that of the plaintiff and of Kenny Hickman, the deposition of Randy Newton, and the expert opinion of Dr. Jacobson, all of whom maintained that nobody tampered with the battery or removed the vent caps prior to the explosion. Exide characterizes the plaintiff's evidence as "internally inconsistent and obviously contradicted," and insists that the "neutral" testimony of Mr. Rogers was the only reasonable version that the District Court could accept.
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Lirette v. State Farm, supra; Lewis v. State, Through DOTD, 94-2370 (La. 4/21/95), 654 So.2d 311. The relevant question on appeal is not whether the trial court was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993), and citations therein. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the trial court's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Id. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, the court of appeal may find clear wrongness or manifest error even in a finding purportedly based upon a credibility determination. Id. Appellate courts extend deference to the factfinder because the latter has the advantage of watching and listening to the live witness, as compared with the appellate court's reliance on an impassive record; this also respects the proper allocation of trial and appellate functions. Canter v. Koehring Co., 283 So.2d 716 (La.1973). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.; Stobart v. State, supra.
Donald Hickman, Kenneth Hickman and Randy Newton testified clearly and consistently that nobody tampered with, mistreated or removed the vent caps from the battery from the time it was installed until the time of the explosion. Dr. Jacobson presented a cogent, scientific explanation of how the explosion could have occurred in a battery with the vent caps in place and otherwise intact. Exide's contention that the plaintiff's evidence is "internally inconsistent and obviously contradicted" lacks merit.
At the close of trial, before taking the case under advisement, the District Court stated that "while there has been some testimony of activities which are * * * questionable that were testified to by Mr. Rogers," the court did not find as a matter of fact the "necessary preponderance of evidence of * * * misconduct or any type of aggressive action" upon the battery, and "no intervening negligence." R.pp. 889-890. This oral ruling shows that contrary to Exide's argument in brief the court did indeed consider Mr. Rogers's testimony but rejected it as insufficient to offset the plaintiff's evidence. A cursory review of the transcript supports the trial court's call. Mr. Rogers admitted that he could not really tell the plaintiff, Donald *540 Hickman, apart from his twin brother, Ronald, who lived on the same street. He didn't actually see anyone working on the battery, because the raised hood blocked his view. Moreover, in a pre-trial deposition, Mr. Rogers made no mention of the "hostile motions" that he attempted to describe at trial. R.pp. 615-617. This record provides absolutely no basis for upsetting the District Court's decision to disregard Mr. Rogers's testimony. Stobart v. State, supra. We will therefore not disturb the findings that neither the plaintiff nor any of his family members tampered with the battery after its installation and, consequently, that the battery was defective when it left the manufacturer.

Comparative fault
By its fourth assignment Exide contends that if the finding of liability is not plainly wrong, then the District Court erred in assigning only 10% fault to the plaintiff. In support it cites Dr. Jacobson's testimony that all batteries have the potential to explode, the warning printed on the vent cap that Hickman admittedly did not read,[2] and Randy Newton's perception of his father as "an old shade tree mechanic." R.p. 532. Exide argues that with his knowledge and the warning on the battery, Hickman acted carelessly and should be assigned much more than 10% comparative fault.
In assessing the nature of the parties' conduct for purposes of comparative negligence, various factors are considered: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). The District Court's allocation of fault is subject to the manifest error rule. Cay v. State, Dept. of Transp., 93-0887 (La. 1/14/94), 631 So.2d 393; Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984).
This record provides precious little to support a finding of any comparative fault. Donald Hickman did not tamper with or abuse the battery in any way. He denied that he was a "shade tree mechanic," even though his son called him that; most of his experience was changing oil himself. R.p. 547. The accident occurred too fast for Hickman to have read the warnings on the caps, and there is no evidence that he drew his face unusually close to the top of the battery, thus distinguishing the case from Harper v. State Farm Mut. Auto. Ins. Co., 484 So.2d 737 (La.App. 1st Cir.), writ denied 489 So.2d 246 (1986). If we were sitting as the fact finder, we would be inclined to assess less fault, perhaps none, to Mr. Hickman on the instant record. Under the circumstances, the District Court did not assign an abusively low percentage of fault, and the allocation will be affirmed.

Back injury
By its fifth assignment Exide contends the District Court erred in finding that Hickman injured his back as a result of the battery explosion. According to Exide, "the various stages of Mr. Hickman's condition and the timing of his complaints makes [sic] it evident that Mr. Hickman's claim of back injuries from the battery explosion is contrived." Br., 31. The argument consists of a recapitulation of Hickman's medical history and attacks on his credibility. At oral argument, counsel for Exide conceded that its position is entirely factual.
The District Court's factual findings are regulated by the manifest error rule. Stobart v. State, supra. A defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. When the defendant's negligent conduct or strict liability aggravates a preexisting injury or condition, he *541 must compensate the victim for the full extent of his aggravation. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993), and citations therein; American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991).
In our view, the District Court considered and balanced all the competing claims with respect to Hickman's back injury. The record supports the finding that the second surgery and the proposed third surgery were necessitated by the battery explosion. Razza Dep., 27, 31. We find no manifest error in the court's findings, which we reproduce and adopt as our own:
By far the most serious and problematical of Donald Hickman's injuries is his back condition. Prior to the battery explosion plaintiff was being treated by Dr. Razza who has a special practice dealing with spinal disorders. After Hickman suffered the work-related injury, Dr. Razza performed a significant surgical procedure on April 20, 1988. Hickman had been diagnosed with L5 discogenic pain syndrome secondary to an internal disc disruption. Dr. Razza performed a lumbar laminotomy, a partial superior and inferior fascetectomy, a foraminotomy at L5-S1 with postlateral fusion using a pelvic bone graft. The object of this procedure was to take pressure off the affected vertebra segment and stabilize it by planting bone between the vertebra in hopes that it would grow and create a continuous bony bridge. The process takes considerable time, usually between six and 12 months, before the bone can become fully consolidated. The term pseudoarthrosis, meaning false or incomplete union, is used to describe a condition in which full bone healing has not yet occurred because of insufficient passage of time. After this April 1988 surgery, Dr. Razza gave a prognosis of maximum medical recovery of about one year, with a 10% disability to the body as a whole at that time.
On May 24, 1988 Dr. Razza saw Donald Hickman for the first post-op visit and improvement was noted. While there [was] still some episodic back pain where Donald Hickman's legs had given way, Dr. Razza noted improvement occasioned by Hickman walking up to two miles a day. A moderate weight loss of 17 pounds was noted, as was good healing of the wound.
Donald Hickman's next visit to Dr. Razza's clinic was on June 20, 1988 wherein he was seen by Dr. Razza's associate, Dr. Ransom. Dr. Ransom noted a pain rating of 10 out of 10, which represented a setback from the May 24, 1988 visit. Hickman again complained of left leg pain and reported another fall but that he was still walking between two and three miles a day. No complaints of right leg pain were observed on either the May visit or the June visit.
The next visit Donald Hickman made to Dr. Razza was on September 15, 1988. On this visit, Hickman reported the battery blowing up in his face in August and that he fell backwards about five feet. He complained that his back pain had worsened, as [had] his left leg pain and, significantly, he also reported a new symptom of right leg pain. Finally, Hickman had reported that due to exercise and weight loss, he had lost approximately 75 pounds prior to the August accident.
On examination Dr. Razza noted marked tenderness in the low back, moderate spasm and a marked restrictive range of motion. He noted positive straight leg raising test in both legs with weakness in each. Dr. Razza related the new symptoms by way of history to the battery explosion in August 1988. Razza recommended further time and conservative treatment together with an updated CT scan and MRI for the low back. The CT scan showed a minimal focal bulging of L5, which was a new finding that had not appeared on any previous reports.
An EMG, nerve conduction study and saline discogram were performed on January 17, 1989. These tests indicated chronic L4 nerve root pathology bilaterally which would explain the bilateral leg symptoms. Dr. Razza also noted that this would be compatible with the disc problem at L4 and L5, the level above the previous operation. It should be noted that on both the September and January visits, Dr. *542 Razza observed that there had not yet been total bone consolidation from the April 1988 surgery. Rather, he observed the presence of scar tissue union in between islands of bone. Dr. Razza likewise related by history the incomplete union to the battery explosion. Because of Hickman's age being over 40 and the existence of a degenerative condition known as spondylosis, Dr. Razza considered Hickman somewhat predisposed to suffering traumatic injuries to the back area.
Dr. Razza performed a second surgical procedure on April 19, 1989, coincidentally nearly one year to the date of the first surgery procedure, in which he fused the L4-L5 segment and revised the previous fusion site at L5-S1 through the use of a plate and pedicle screw internal fixation device. A discectomy was also performed at L4-L5. Dr. Razza assigned an additional 10% disability following the second surgical procedure which was related by history to the battery explosion. Dr. Razza specifically opined that for a person such as Mr. Hickman, who has been involved in manual labor virtually all of his working life, the total body impairment was fairly well totally disabling for purposes of the return to the workforce in a manual labor capacity. Dr. Razza agreed that the functional problems that Donald Hickman would experience because of his prior work history are greater than any percentage numbers attached to mere anatomical disability.
Dr. Razza unequivocally recommends a third surgical procedure which he again relates to being occasioned by the battery accident. Dr. Razza believed that despite the use of internal fixation and fusion revision procedures, Hickman had not yet established a full union and that an additional surgery might afford him long-term protection to the spine which had been unable to be attain[ed] as of yet. He estimated the cost of this third surgical procedure to be approximately $50,000.00 between the surgeon's fee, the hospital stay, anesthesia, etc.
Dr. Razza found Donald Hickman to be forthright and cooperative, a good historian and that he had no difficulty in taking his history at face value. He concluded, in response to plaintiff's counsel's direct question, that the battery incident caused a significant aggravation of [his] pre-existing post-surgical condition.
On cross-examination, Dr. Razza noted that plaintiff's twin brother Ronald Hickman had been called a "poor bone healer" and that this fact alone might tend to place Donald Hickman in a category of not healing bone well, more so than someone in the average population. Dr. Razza agreed that, while trauma is one important factor, hereditary genetics is also a factor. During cross-examination, counsel for the defendant points out that the plaintiff had suffered a number of falls following the battery explosion in August 1988, suggesting that perhaps those events could equally have impaired the healing process at the fusion sites. Dr. Razza conversely viewed the situation as being that the ongoing falls were associated with the nerve damage in the legs, which in turn was associated with his low back condition. Dr. Razza believed that the falling episodes were more of a manifestation of his back problems rather than a cause of them. * * *
Plaintiff seeks to recover for the cost of a future surgery which was described by Dr. Bruce Razza in his trial deposition. He estimates this cost of be approximately $50,000.00 including surgeon's fee, hospital stay, anesthesiologist fee and the like. * * * Dr. Razza unequivocally believes the third surgery to be necessary for Mr. Hickman to reach maximum medical recovery. Mr. Hickman understandably is none too eager to climb back on the orthopaedic surgeon's table for a third time for more back surgery. The testimony does preponderate, however, that plaintiff probably would have had the surgery undertaken had he been financially able to do so. The court finds that the plaintiff is entitled to recover for future medical expenses in the amount of FIFTY THOUSAND ($50,000.00) DOLLARS AND NO 100 and awards that sum.

Damages
By its sixth assignment Exide urges the award of general and special damages is *543 excessive. In brief Exide chiefly argues Hickman did not really injure his back in the accident, and argues that the part of the special damage award for the third surgery, and that of the general damage award for back pain, must be reversed. For the reasons already discussed, we do not find manifest error in the District Court's conclusions regarding Hickman's back, and will not disturb these portions of the award.
The District Court has great discretion in assessing damages. La.C.C. art. 2324.1; Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). The court found that as a result of the accident Hickman sustained, in addition to worsened back pain and a prolonged recovery, temporary blindness, recurrent eye pain, chronic chemical rhinitis and a dead-smelling sensation in his nose because of acid burns, periodic headaches, partial hearing loss and slight tinnitus, and slight vertigo. Exide does not seriously contest these findings in brief and, in our view, the record supports the award of $200,000 in general damages. Hae Woo Youn v. Maritime Overseas Corp., supra. It will not be disturbed.
Exide's only other contention is that the record lacks justification for the award of future lost earnings. The District Court awarded lost past income and lost earning potential based on Dr. Razza's original opinion that Hickman would be able to engage in minimum-wage employment by April 1989, but because of his worsened condition from the battery explosion he was much more than 20% disabled. An economist, Dr. Randy Rice, fixed past minimum wage losses at $55,627, which the court awarded. Dr. Rice also estimated future lost earnings at $128,627, of which the court awarded $50,000. Awards for lost earning capacity are inherently speculative. Hobgood v. Aucoin, 574 So.2d 344 (La.1990). In light of Dr. Razza's opinion of Hickman's prospects of returning to work, of the disability rating, and of Dr. Rice's calculations, we do not find the instant award to be an abuse of the District Court's great discretion. Hobgood v. Aucoin, supra; Harig v. State, Bd. of Elementary & Secondary Educ., 25,702 (La.App. 2d Cir. 3/30/94), 635 So.2d 485, 493, 90 Ed.L.Rep. 1324. This assignment lacks merit.

Conclusion
For the reasons expressed, the judgment is AFFIRMED at Exide Corporation's costs.
AFFIRMED.
NOTES
[1] La.R.S. 9:2800.51 through .59 became effective September 1, 1988. La. Acts 1988, No. 64, § 2. The Act was held not retroactive in Gilboy v. American Tobacco Co., 582 So.2d 1263 (La. 1991), and previously in Berry v. Commercial Union Ins. Co., 565 So.2d 487, Prod.Liab.Rep.P. 12,648 (La.App. 2d Cir.), writ denied 569 So.2d 959 (1990).
[2] The warning stated: "Danger EXPLOSIVE GASES. Cigarettes, flames or sparks could cause battery to explode. Always shield eyes and face from battery. Do not charge or use booster cables or adjust post connections without proper instructions and training. KEEP VENT CAPS TIGHT AND LEVEL." Ex. D-64.