775 So.2d 64 (2000)
S. KOTTLE, Plaintiff-Appellee,
v.
PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, Defendant-Appellant.
No. 34,099-CA.
Court of Appeal of Louisiana, Second Circuit.
December 15, 2000.
Rehearing Denied January 18, 2001.
*65 Wilkinson, Carmody & Gilliam by Bobby S. Gilliam, Shreveport, Counsel for Appellant.
Nelson, Hammons & Self by John L. Hammons, Shreveport, Counsel for Appellee.
Before NORRIS, C.J., and BROWN and CARAWAY, JJ.
*66 CARAWAY, J.
This dispute involves a claim by a physician for disability insurance benefits resulting from a mental condition which prevented the physician's work as a nephrologist. The insurer disputes the trial court's view under the terms of the policy that the doctor was rendered disabled by his panic disorders, or that appropriate medical care has been sought to alleviate any disability. The plaintiff answered the insurer's appeal, claiming penalties and attorney's fees for the failure to pay the claim. Finding that the trial court did not misconstrue the policy and was not clearly wrong in its findings of fact, we affirm.

Facts
In 1975, Dr. Sheldon P. Kottle ("Dr.Kottle") acquired a disability policy from Provident Life & Accident Insurance Company ("Provident") providing, in the event of disability, payments of $6,000 per month. At the time the policy was issued, Dr. Kottle was a medical doctor, specializing and board certified in internal medicine and nephrology. In 1987, Dr. Kottle applied for a new policy, adding an additional $6,000 per month in disability coverage. The new policy provided for $12,000 per month for disability benefits, plus cost of living adjustments ("COLA"), and a waiver of premium payment upon disability.
Dr. Kottle founded a nephrology group in Shreveport, Louisiana in 1977, and practiced nephrology there from 1977 through 1991. In 1992, he and his family moved to Phoenix, Arizona, where he joined a large nephrology group. On March 25, 1996, Dr. Kottle withdrew from the Arizona nephrology group, because of panic attacks that he claims prevented him from providing safe and appropriate care to his patients.
Dr. Kottle relates a history of panic attacks back to the 1980s. During that time, Dr. Kottle described experiencing symptoms such as shortness of breath, sweating, chest pains, and an accelerated heart rate. He sought informal medical treatment and/or advice from his colleagues regarding his symptoms. The symptoms increased over time and worsened in severity over the next decade. Beginning in the late 1980s and early 1990s, Dr. Kottle experienced attacks at unpredictable times and places. The attacks occurred while Dr. Kottle was treating patients at the hospital, while driving his car and while seeing patients at his office. At other times, the panic attacks occurred at basketball games, on airplanes, and at the dentist's office.
On a number of these occasions, co-workers and colleagues in Shreveport observed Dr. Kottle and his reaction to these symptoms. At trial, Johnnie Sandifer Marshall, a nurse who worked with Dr. Kottle in Shreveport, described three separate occassions where Dr. Kottle was choking, sweating, and experiencing an increased pulse rate. Once, Dr. Kottle left his office after seeing only a few patients. On each of these occasions, Dr. Kottle asked Marshall to drive him home.
Several physicians testified at trial about not only their personal observations of Dr. Kottle during his attacks, but also about the results of diagnostic tests performed to rule out coronary artery disease and/or heart attack. The tests did not reveal any abnormalities with Dr. Kottle's heart, nor did they reveal any other physiological cause for Dr. Kottle's symptoms.
Dr. Mark Callaway, a Shreveport urologist, testified that he worked alongside Dr. Kottle on several patients. Dr. Callaway witnessed several events involving Dr. Kottle that he described as "bizarre." Shortly after Dr. Kottle's thyroid surgery, he summoned Dr. Callaway to his home, because he thought he had a kidney stone. Dr. Callaway evaluated plaintiff, and found no typical symptoms of a kidney stone. Dr. Callaway described Dr. Kottle as agitated, anxious, and "almost panicky at that point." Furthermore, Dr. Callaway recalled that Dr. Kottle seemed to avoid performing percutaneous renal biopsies on *67 patients. He described percutaneous renal biopsies as a low risk procedure. Lastly, Dr. Callaway described Dr. Kottle as becoming more aloof and less focused. He testified that Dr. Kottle was retracting from patient care and the hospital.
Dr. Philip J. Garavaglia, a nephrologist, practiced with Dr. Kottle in Shreveport for 4-½ years. Dr. Garavaglia described the practice of nephrology for the trial court:
"Nephrology is a subspecialty of internal medicine that provides care to patients with advanced kidney failure and complex mineral and electrolyte disturbances. Generally it treats the most complex patients in medicine, people who have kidney transplants and dialysis patients. It's a difficult specialty in general, overlaid by a great deal of psychological problems in the patients that affect their care adversely."
Dr. Garavaglia also stated that a number of nephrology patients, by the very nature of their underlying health, are critically ill. Also, when asked whether a clinical nephrologist could practice without treating critically ill patients, he responded, "I don't see how it would be possible. The occurrence of unexpected emergencies is very frequent in our practice, as it is in all nephrology."
Additionally, Dr. Garavaglia testified that Dr. Kottle was one of the best nephrologists with whom he has ever worked. However, Dr. Garavaglia stated that in June or July of 1991, he noticed a change in Dr. Kottle's behavior. He noticed that Dr. Kottle was trying to shift some of the work to other members of the group. Also, in the fall of 1991, Dr. Garavaglia received a call that Dr. Kottle became agitated at work and left the office with several patients waiting to be seen. Dr. Garavaglia said that although this behavior was "odd," he thought that Dr. Kottle was just "stressed out."
Dr. Sanders Hearne, a Shreveport cardiologist, testified that eight to ten years ago, he was asked to go to the doctors' lounge at the hospital, because Dr. Kottle was having chest discomfort and was very anxious. Dr. Hearne stated that Dr. Kottle believed that he was having a heart attack. Dr. Hearne ordered an EKG. The EKG was normal, so Dr. Hearne told plaintiff that he did not believe that he was having a heart attack. Dr. Hearne did not provide any other treatment or diagnostic tests for this event. Dr. Hearne further testified that from his observation of Dr. Kottle during that event, it is his opinion that Dr. Kottle could not have provided adequate care to his patients during the attack.
Dr. Kottle's wife, Ronda Kottle, also testified. She stated that between 1990 and 1992, she observed that Dr. Kottle would stay home more often. Before 1990, Dr. Kottle worked from early in the morning, until late at night. He worked approximately 15 hours per day and loved complex cases. She also described how Dr. Kottle's behavior worsened from the time they moved to Phoenix until the time he stopped practicing medicine. She also witnessed her husband's attacks and would see him holding his chest, sweating profusely, being short of breath, and sometimes experiencing abdominal distress. Ronda believes that her husband quit practicing nephrology, because "he got to the point where he didn't feel like he could take care of his patients."
When asked about his 1991 move to Phoenix, Dr. Kottle testified that he moved because of several life stressors, such as his recent bout with thyroid cancer, his unexplained chest pains, and his father's death. Furthermore, due to these unexplained chest pains and other bothersome symptoms, Dr. Kottle wanted his family to be close to other family members in Arizona in case he died.
In Phoenix, Dr. Kottle joined a large nephrology group. Dr. Kottle took a position that required more traveling, hoping that he would become less involved with critically ill patients. This strategy worked briefly.
*68 Dr. Kottle testified about the increasing nature of his attacks. He stated that in 1992-1993, he had two panic attacks. In 1993-1994, he experienced a few more sporadic attacks; however, the attacks were more severe and prolonged. During this same time frame, he began to lose confidence in his abilities as a clinical nephrologist and began to have anticipatory anxiety. By 1995, Dr. Kottle stated that he was having panic attacks once a week and sometimes on a daily basis. He explained that around 90% of his attacks occurred at work.
Dr. Kottle further testified that when he would have a panic attack, he would try to get to his car to go home. If the attack was severe, he would try to hide in a restroom. Notably, Dr. Kottle's testimony regarding his attacks in Phoenix was not corroborated by testimony from other doctors or work associates.
From 1992 to 1996, Dr. Kottle was "buying into" the Phoenix nephrology group and was three months away from becoming a partner when he left the practice in March, 1996. When asked why he left the practice, Dr. Kottle stated that in early 1996, while on weekend call, he could not respond to a critically ill patient, due to having a panic attack. He drove to the hospital, but could not get out of the car. He claims that he could not determine how to treat the patient. Dr. Kottle never made it into the hospital to check on his patient. The patient died. A subsequent investigation of the incident revealed that the patient would have died from a malignancy, and that Dr. Kottle's care was not substandard. Although cleared by the investigation, Dr. Kottle's confidence in his ability to practice medicine was completely shaken. At this point, Dr. Kottle realized that the degree and frequency of his attacks were so severe and debilitating that he was unable to effectively treat his patients.
Dr. Kottle also testified about the treatment he sought for his illness. Around the beginning of 1990, Dr. Kottle informally sought advice and treatment from a psychiatrist in Shreveport, Dr. Shahidul Islam. Dr. Islam testified at trial that he began treating Dr. Kottle continuously by 1997.
Although the evidence regarding Dr. Kottle's condition and treatment is disputed for the time between March 1996 and March 1997, Dr. Kottle testified that he arranged a "formal" visit with Dr. Islam in March or April, 1996. He explained that from March through June, 1996, he spent approximately 98% of his time at home. He stayed in his pajamas and often would not even shave. Dr. Islam helped Dr. Kottle through cognitive therapy, and after a few months, plaintiff thought he would be cured. In late 1996, Dr. Kottle hired a nurse and opened an office to give free medical advice over the phone, yet he did not see any patients for two years. He had periods of time when he could not go to the office, and the nurse would stay at the office alone all day. He closed the office in 1998.
In 1997, Dr. Kottle began teaching medical students and residents at Arizona State University and Good Samaritan Hospital in Phoenix. Also, Dr. Kottle was developing computer software with his son and started a consulting business, rendering opinions in medical malpractice cases.
On February 27, 1997, Dr. Kottle informed Provident of his intent to file a claim for disability benefits. On March 13, 1997, he submitted a statement of claim and completed a physician questionnaire to Provident. The questionnaire included a March 12, 1997 report from Dr. Joe Ben Hayes, a Shreveport psychiatrist. Dr. Hayes' report concluded that Dr. Kottle was suffering from generalized anxiety disorder identified with panic disorder, as well as elements of post traumatic stress disorder. Dr. Hayes opined that Dr. Kottle was totally disabled from performing his duties as a clinical nephrologist.
On March 20, 1997, Dr. Kottle spoke with Provident's claim representative, *69 Laura Harnsberger Parker. Parker attempted to gather more information regarding Dr. Kottle's claim. On March 21, 1997, Parker again spoke with Dr. Kottle, and told him that the information he provided Provident indicated that his "occupation" at the time of his March, 1997 claim was that of a non-working physician. On April 7, 1997, Provident denied Dr. Kottle's claim based on the information provided and concluded: (1) that Dr. Kottle's occupation was that of a "non-working physician" or a "software developer;" (2) that Dr. Kottle could perform the duties of a "non-working physician;" (3) that Dr. Kottle has had these "symptoms" since the 1970s; and (4) that Dr. Kottle was not receiving "appropriate care" for his condition as provided for in the insurance policy.
Dr. Kottle's attorney sent a formal demand letter to Provident after the April 7, 1997 denial. Responding to the demand letter, Provident requested additional information from Dr. Hayes. Dr. Hayes, who only saw Dr. Kottle on March 12, 1997, returned Provident's questionnaire unanswered, because he did not consider himself to be Dr. Kottle's treating physician. At this time, Provident's medical records request of Dr. Islam indicated that no records existed. After receiving no further information regarding Dr. Kottle's treatment, on June 3, 1997, Provident again denied his claim for disability benefits.
Dr. Kottle filed suit on August 25, 1997, seeking total disability benefits and penalties and attorney's fees for the arbitrary and capricious denial of his claim. Provident contested Dr. Kottle's claim, asserting that Dr. Kottle voluntarily withdrew from his nephrology practice to seek other career opportunities and claiming that Dr. Kottle was not receiving appropriate care for his condition.
At the time of the September 1999 trial, Dr. Kottle remained employed part-time as a teacher at Arizona University and was consulting in medical malpractice cases, but had never testified as an expert witness in a trial for any case. His reported income for 1998 was $32,000. On cross examination, Dr. Kottle described his condition at the time of trial as follows:
A. "... I can drive, I can go places, I can eat, I can go out, I can fly, I can go to games, I can go to ball games. I seem to be okay most of the time.
Q. But my question was: You can do just about anything except the material and substantial aspects of practicing nephrology, in your opinion?
A. Yes, sir."

Policy Provisions
The key provisions of the Provident disability policy which govern this dispute are as follows:
Definitions

Sickness means sickness or disease which is first manifested while your policy is in force.
* * * * *

Total Disability or totally disabled means that due to Injuries or Sickness:
i. you are not able to perform the substantial and material duties of your occupation; and
ii. you are receiving care by a Physician which is appropriate for the condition causing the disability

your occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.
* * * * *

Elimination Period means the number of days of disability that must elapse in a period of disability before benefits become payable. The number of days is *70 shown on Page 3 [90 days]. These days need not be consecutive; they can be accumulated during a period of disability to satisfy an Elimination Period. Benefits are not payable, nor do they accrue, during an Elimination Period.
* * * * *
Benefits
Total Disability
We will pay the Monthly Benefit for Total Disability shown on Page 3 as follows:
1. Benefits start on the day of Total Disability following the Elimination Period.
2. Benefits will continue while you are totally disabled during the period of disability but not beyond the Maximum Benefit Period.
Claims
Notice of Claim
Written notice of claim must be given within 20 days after a covered loss starts or as soon as reasonably possible.
* * *
Claim Forms
When we receive your notice of claim, we will send you claim forms for filing proof of loss. * * * You must give us this proof within the time set forth in the Proof of Loss section.
Proof of Loss
If the policy provides for periodic payment for a continuing loss, you must give us written proof of loss within 90 days after the end of each period for which we are liable. * * *
If it was not reasonably possible for you to give written proof in the time required, we will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible. In any event, the proof required must be furnished no later than one year after the 90 days unless you are legally unable to do so.
* * * * *
Time of Payment of Claims
After we receive written proof of loss, we will pay monthly all benefits then due you for disability. Benefits for any other loss covered by this policy will be paid as soon as we receive proper written proof.
Legal Actions
You may not start a legal action to recover on this policy within 60 days after you give us required proof of loss. You may not start such action after three years from the time proof of loss is required.

Expert Testimony
Several medical experts testified for both parties. The expert testimony centered on two major issues. First, the experts differed in their description of the nature of the psychological disorder affecting Dr. Kottle, and as to the disorder's proper treatment (although all agreed that psychotherapy and drug therapy are essential). Provident's experts dispute that Dr. Kottle has obtained proper treatment. Secondly, the experts rendered differing opinions regarding Dr. Kottle's diagnosis and whether or not the diagnosis rendered him disabled from the practice of clinical nephrology.
All of Dr. Kottle's expert witnesses testified that he suffers from panic disorder. Along with the panic disorder diagnosis, some of plaintiff's experts stated that he suffers from generalized anxiety disorder, Obsessive Compulsive Disorder ("OCD"), phobia, and agoraphobia. On the other hand, Provident's experts diagnosed Dr. Kottle with Anxiety Disorder Not Otherwise Specified ("ADNOS"), OCD, some depression and histrionic traits, and avoidant behavior. The experts also discussed Dr. Kottle's current global effective level of functioning ("GAF") and the highest the patient has functioned within the past year. The GAF is represented by a numerical *71 value. The testimony revealed that a physician should function at a GAF of 90.
A diagnosis of "panic disorder" requires sudden bursts of anxiety that may occur for no reason. Diagnostically, one has to have at least two panic attacks on two occasions that are unrelated to specific events. Panic disorder was defined at trial as an "abrupt and intense fear of such intensity that the person is usually immobilized and has symptoms making them think that they are facing death or impending doom, and they feel frozen and totally hopeless." Symptoms of panic disorder include chest pain, heart palpitations, shortness of breath, nausea, dizziness, shakiness, feelings of fear, feelings of losing control, sweatiness, and trouble concentrating. A person suffering from panic disorder can become disabled. Also, panic disorder can be diagnosed with or without agoraphobia.
"Agoraphobia" is a phobic or avoidant condition that is usually associated with some specific stimulus. Agoraphobia was described as a progressive mental problem that, to its extreme, could render patients so incapacitated by their environment that they tend to isolate themselves in home or avoid certain situations. Agoraphobia can also be episodic, meaning that the agoraphobia is related to what is going on in the person's life.
One expert testified that ADNOS "is a condition that involves a significant degree of anxiety that does to some degree affect one's ability to perform socially, occupationally, or cause significant emotional distress, yet it cannot be clearly assigned to any of the other categories. It might include elements of panic, it might include elements of generalized anxiety, or it might include none of those but just fall somewhere outside the characteristics that one can neatly place into the other categories."
OCD was described as an anxiety disorder "where people have repetitive thoughts, they may check things over and over or count, and they go through ritualistic sort of behavior." Further, people with OCD frequently insist on things being done their way and have a desire for control. In Dr. Kottle's case, none of the doctors believed that the OCD alone was impairing. Plaintiffs experts did, however, agree that the OCD diagnosis added to his panic disorder and that "[i]t only makes his panic disorder with agoraphobia worse, because he is constantly checking things over and over but doubting himself even more."
Additionally, the experts' differing diagnoses stemmed from their disagreement as to whether or not panic attacks, so severe in degree and intensity so as to cause panic disorder, are "situationally bound." The "situationally bound" condition means that a majority of the patient's attacks arise in certain circumstances that have some general descriptive nature. Plaintiffs experts tend to agree that it is possible for a person to have attacks in one aspect of his life, and yet function normally in other aspects of daily life. Generally, they testified that Dr. Kottle's attacks are "situationally bound" in that he experiences panic episodes when he is faced with treating critically ill patients, or when he is faced with making life-death type decisions. On the other hand, the defense's experts stated that if a person suffers from panic disorder, his entire life is affected by the unpredictability of the attacks, and that attacks do not occur only in certain life situations.
Insofar as treatment of panic disorder, all of the experts agreed that the "gold standard" of treatment is a combination of drug therapy and psychotherapy or cognitive therapy. The drugs used to treat panic disorder consist of either benzodiazepines, such as Xanax or Valium, or Serotonin Specific Reuptake Inhibitors ("SSRIs"), such as Prozac or Zoloft. Benzodiazepines were described as "highly addictive," and the experts agreed the addictive quality of the drug is a factor to *72 consider when prescribing this type of drug to a practicing physician. Furthermore, Dr. Paul Ware stated that benzodiazepines metabolize the same way as alcohol, thereby rendering the patient "under the influence." Plaintiff's experts testified that if a patient cannot tolerate drug therapy, then the chances of resolving or controlling the panic disorder with cognitive therapy alone are very poor.
"Cognitive therapy" consists of several modalities of psychotherapy, including workbooks, homework assignments, desensitization exercises, relaxation techniques, and face-to-face therapy. Due to the distance between Dr. Kottle and his treating physician, Dr. Islam, many "therapy sessions" occurred by the telephone. Telemedicine, or therapy by telephone, was highly criticized by the defense during trial. However, there was also evidence presented by plaintiff about the importance of trust in a physician/patient relationship, and that once a trusting relationship is established, use of telemedicine is an acceptable method of providing therapy.
Dr. Islam testified at length regarding his diagnosis and treatment of Dr. Kottle since 1996.[1] Dr. Islam is an expert in the field of psychosomatic diseases. Dr. Islam's practice primarily focuses on patients with panic disorder. Dr. Islam stated that there is no specific objective test to diagnose panic disorder, but he testified that he never saw evidence that Dr. Kottle was malingering. Dr. Islam diagnosed plaintiff with panic disorder and OCD. Furthermore, Dr. Islam stated that although panic disorder is a treatable disease, as many as 50% of patients relapse.
Dr. Islam attempted pharmacological treatment, but Dr. Kottle experienced varying side effects with both the benzodiazepines and the SSRIs. Dr. Islam therefore no longer considers drug therapy a viable option for treating Dr. Kottle. Also, Dr. Islam stated that without the use of pharmacological therapy, the chances of resolving or controlling plaintiff's panic disorder with cognitive therapy alone is very poor, because any stressful situation is likely to precipitate an attack. Regarding the issue of whether Dr. Kottle was receiving "appropriate care" for his condition, Dr. Islam testified that he has known Dr. Kottle for a long time, that he went to Dr. Kottle's home in Phoenix, and Dr. Kottle visited him at his office in Shreveport many times. Furthermore, Dr. Kottle speaks to Dr. Islam on the phone 2-3 times per week or, at a minimum, once a week. Also, Dr. Kottle calls Dr. Islam when he experiences an attack. Based on the last three years of treatment, Dr. Islam does not recommend plaintiff's return to his clinical nephrology practice. When asked about plans for further treatment, Dr. Islam stated that he would continue with exposure therapy and cognitive therapy.
Dr. Kottle also retained a medical examiner, Dr. George Seiden, and called Dr. Seiden as an expert witness during his case-in-chief. Dr. Seiden specializes in psychiatry, with a subspecialty in forensic psychiatry. Dr. Seiden diagnosed Dr. Kottle with panic disorder with agoraphobia. Testimony showed Dr. Kottle receiving a 65 GAF score, which is below the level needed to be a functioning physician, but not so impaired so as to need acute hospitalization.
Further, Dr. Seiden testified that panic disorder can ordinarily be effectively treated, but with Dr. Kottle's failed attempts at pharmacological therapy, cognitive therapy is the only treatment available to him. Dr. Kottle told Dr. Seiden about his failed trials of Xanax, Prozac and Zoloft, and Dr. Seiden opined that after the third drug failure, it is highly unlikely to find a successful medication to treat panic disorder.
*73 The defense presented the testimony of three expert witnesses, all of whom met with Dr. Kottle. Dr. Dean Robinson reviewed the reports from plaintiff's experts and concluded that there was evidence that Dr. Kottle was refusing therapy. Also, Dr. Robinson testified that panic attacks are unlikely to occur in only one specific area of a person's life with no symptoms in other areas of his life. Dr. Robinson opined that Dr. Kottle "probably" suffers from ADNOS and OCD.
Additionally, Dr. Robinson criticized Dr. Islam's extensive use of "telemedicine," stating that face-to-face therapy is the preferred method of treatment. Overall, Dr. Robinson felt as though consistent appropriate care was not provided in this case, and that Dr. Kottle is not totally disabled.
Provident also called Dr. Thomas E. Staats as an expert. Dr. Staats has a Ph.D. in counseling and clinical neuropsychology. Dr. Staats met with Dr. Kottle, obtained his history, and administered a malingering test. In his opinion, Dr. Kottle did not receive any formal therapy. Further, Dr. Staats does not believe that telephone therapy, as administered by Dr. Islam, constitutes appropriate care. Dr. Staats testified that Dr. Kottle is suffering from ADNOS with some depression, histrionic traits and OCD. Tests also revealed that plaintiff has some panic attacks and phobic avoidant behavior. Insofar as Dr. Kottle's claim that his panic attacks are situationally bound, Dr. Staats testified that panic attacks occur in all sorts of life situations. However, on cross-examination he did admit that situational panic attacks do occur in some patients. Dr. Staats concluded that Dr. Kottle's change in occupation appeared to be self-imposed, because of his "refusal" to undergo formal therapy. However, the doctor does not believe that Dr. Kottle is malingering, even though he opines that Dr. Kottle is not receiving appropriate care to treat his illness.
Dr. Nelson Hendler, a psychiatrist, examined Dr. Kottle in September, 1998. Dr. Hendler diagnosed plaintiff with OCD and avoidant behavior. The doctor also noted that Dr. Kottle meets diagnostic criteria for phobic reaction more than he meets the criteria for panic disorder. Dr. Hendler stated that Dr. Kottle did not receive appropriate care for his condition, and his testimony implied that Dr. Islam's personal relationship and friendship with Dr. Kottle prevented appropriate therapy in this case. Lastly, Dr. Hendler concluded that Dr. Kottle was not disabled in 1996-1997 from the occupation of a computer software developer or teacher, because "he was doing them." Further, he did not believe that Dr. Kottle was disabled from practicing as a nephrologist.

Trial Court's Ruling
Following a bench trial, the trial court rendered judgment finding Dr. Kottle was entitled to disability benefits retroactive to March 26, 1996. The trial court denied Dr. Kottle's claim for penalties and attorney's fees without reasons.
The trial court's findings of fact track the progression of Dr. Kottle's illness, beginning in the 1980s. The court noted that Dr. Kottle's panic attacks increased in both severity and frequency. Also, the trial court found that the medical testimony established that the symptoms Dr. Kottle experienced were due to panic attacks, and that some of the attacks are so severe that Dr. Kottle is rendered unable to perform a number of his functions as a nephrologist.
Additionally, the trial court found that Dr. Islam was Dr. Kottle's treating psychiatrist, and that Dr. Kottle underwent at least two unsuccessful attempts at pharmacological therapy, choosing not to undergo further drug therapy due to health risks. Furthermore, the trial court found that in March, 1996, Dr. Kottle's "panic attacks became so severe and debilitating that he was virtually unable to effectively treat patients. Compelled to act in the best interest of his patients, Dr. Kottle left the practice of nephrology...."
*74 Based on these findings of fact, the trial court concluded that Dr. Kottle was "unable to perform the substantial and material duties of his occupation at the time he left his practice on March 26, 1996, at the time he filed the claim for disability on March 13, 1997, and at the time of trial." In conjunction with this finding, the trial court also concluded that on each of the above dates, Dr. Kottle was "receiving care by a physician which was appropriate for the condition causing the disability."

Discussion

I.
Four of Provident's assignments of error[2] concern the trial court's interpretation of the insurance contract, and its factual conclusions regarding Dr. Kottle's disability and the appropriateness of the medical care that he has received. Provident does not assert that its policy is ambiguous on these issues. We agree and will construe the policy which represents the law between these parties. Otherwise, as an appellate court, we must review Provident's assignments of error under the manifest error standard.
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error. Stobart v. State, through D.O.T.D., 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The relevant question on appeal is not whether the trial court was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart, supra. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are as reasonable. Rosell, supra. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra. If the trial court's findings are reasonable when the record is reviewed in its entirety then the appellate court will not reverse. Fowler v. Wal-Mart Stores, Inc., 30,843 (La.App.2d Cir.8/19/98), 716 So.2d 511; Hancock v. Safeway Insurance Co., 31,870 (La.App.2d Cir.6/16/99), 741 So.2d 155.
La. C.E. art. 702 provides that if the scientific knowledge of an expert will assist the trier of fact to understand the evidence or to determine a fact in issue, the experts may testify thereto in the form of an opinion. The trier of fact is entitled to assess the credibility and accept the opinion of an expert just as it does with respect to other witnesses, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990); Townsend v. Westinghouse Elevator Corp., 25,966 (La. App.2d Cir.8/17/94), 641 So.2d 1022, writ denied, 94-2371 (La.11/29/94), 646 So.2d 403; Hickman v. Exide, Inc., 28,495 (La. App.2d Cir.8/21/96), 679 So.2d 527, 537.
As stated by this court in the past, "[W]e are fully cognizant of and have striven to take into proper consideration the dangers of abuse that are implicit in the *75 acceptance of mental and nervous disorders and affections as constituting disability." Miller v. United States Fidelity and Guaranty Co., 99 So.2d 511 (La.App. 2d Cir.1957). Reviewing courts must analyze claimed disability caused by mental conditions with utmost caution in view of the nebulous characteristics of mental conditions and the possibility of symptoms being easily feigned. Westley v. Land & Offshore, 523 So.2d 812 (La.1988).
In the construction and interpretation of contracts of insurance, just as with other contracts, the intention of the parties is of paramount importance. This intention is determined in accordance with the plain, ordinary and popular sense of the language which they have used in the agreement, and by giving consideration, on a practical, reasonable and fair basis, to the instrument in its entirety. Beard v. Peoples Industrial Life Ins. Co. of Louisiana, 5 So.2d 340, 342 (La.App. 2d Cir. 1941); Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94), 634 So.2d 1180.
Based on this premise, Louisiana jurisprudence has defined the terms "disabled" or "totally and permanently disabled" broadly. The Louisiana Supreme Court in Crowe v. Equitable Life Assur. Soc. of United States, 154 So. 52, 179 La. 444 (La.1934), stated:
It may be said, generally speaking the provisions in life, health and accident insurance policies for indemnity in case the insured becomes totally, permanently or wholly disabled, etc., do not require that he shall be rendered absolutely helpless, but, rather, merely requires such disability as renders him unable to perform the substantial and material acts of his business or occupation in the usual and customary way. At least such a rule has been in substance adhered to, where the policies required that he be totally disabled from transacting any and every kind of business. (Citing 7 Couch on Insurance, § 1670, p. 5769).
Following Crowe, Louisiana courts have interpreted excessively narrow disability definitions as requiring an "inability to do substantially all the material acts necessary to the prosecution of the insured's business or occupation in substantially his customary and usual manner." Crowe, supra.
Similarly, in Johnson v. State Farm Mutual Automobile Insurance Company, 342 So.2d 664 (La.1977), the court addressed the continuous nature of a plaintiff's disability and held that whether a plaintiff's disability is continuous depends upon the facts and circumstances of each case.
The definition for total disability in the Provident policy is in harmony with Louisiana's longstanding jurisprudential view that the insured who is unable to perform the "substantial and material duties of his occupation" is entitled to policy benefits. Johnson, supra at 667. The insured's intent for economic protection from loss of employment should not be thwarted by narrow policy definitions for total disability requiring absolute helplessness. Id. Additionally, in the Provident definition, the insured's occupation from which he becomes disabled is defined as the "recognized specialty within the scope of your degree and license." This emphasis on Dr. Kottle's medical specialty was confirmed by Provident in letters written in 1975 and 1980 in which the company admitted that "[S]hould disability cause a physician, for example, whose practice is limited to nephrology to be unable to perform the duties of a nephrologist, then we would consider him to be unable to perform the duties of his occupation and eligible for monthly benefits."
In view of the above, Provident does not make in its assignments of error a frontal assault against the trial court's finding that Dr. Kottle has lost his ability to perform as a nephrologist and is thus disabled in his medical specialty. Instead, Provident asserts that Dr. Kottle voluntarily withdrew from his occupation as a nephrologist and engaged in other work endeavors for almost *76 one year before filing his claim in 1997, and, most significantly, that Dr. Kottle showed no compliance with the policy provision requiring the ongoing care by a physician which is appropriate for the condition causing disability.
Before addressing these more technical arguments by Provident regarding the initial timing and continuing nature of the "disability" as defined in the policy, it is important that we first state that the record contains sufficient evidence supporting the trial court's factual determination that in 1996 Dr. Kottle became "unable to perform a number of his daily functions as a treating physician in the field of nephrology." Despite Dr. Kottle's ability at the time of trial to otherwise function normally in most aspects of his life, his prior history of panic attacks on the job and the expert testimony describing his panic disorder as situationally bound support this important conclusion of the trial court.
Provident's argument that Dr. Kottle voluntarily withdrew from his occupation and pursued other work for one year prior to his claim too narrowly construes the disputed policy and is contrary to the jurisprudential view of disability and further employment efforts by the insured. Provident attempts to glean support for its argument from the policy definition of "your occupation," which is the occupation in which the insured is "regularly engaged at the time you become disabled." That provision does not say, however, that disability or occupation is measured from the time of the insured's notice of claim. From our review of the "Claims" section of the policy, the time the insured becomes disabled (in this case March 1996) does not have to coincide with the time the claim is made (March 1997). Under that section of the policy, the insured may be barred from receiving periodic payments for which the insured unreasonably neglects to make a claim. Nevertheless, the insured's failure to timely give notice and provide proof of loss does not result in the loss of all future periodic payments for a continuing disability. Provident's argument, therefore, that Dr. Kottle's occupation for the measure of his disability must be defined and established a year after the time he left his medical practice misconstrues the policy.
Likewise, the fact that Dr. Kottle pursued other employment endeavors upon leaving the practice of nephrology does not change his disabled status under the policy. In Laborde v. Employers Life Insurance Co., 412 So.2d 1301 (La.1982), the supreme court found that the plaintiff could no longer work as a journeyman carpenter and was therefore disabled under the disputed policy, even though plaintiff continued working as a carpenter inspector doing lighter work throughout the two-year benefit period provided by the policy. In Johnson v. State Farm Mutual Automobile Insurance Co., supra, the continuity of the insured's disability was not broken by his seventeen week attempt to return to work in pain from his injury. Given the trial court's conclusion in this case that Dr. Kottle became unable to perform as a nephrologist in March 1996, neither Dr. Kottle's work in other employment, nor the lateness of the filing of his claim prevents him from claiming policy benefits as a disabled nephrologist.
Next, Provident makes two arguments concerning the purpose of the appropriate care provision as contained in the policy's definition for total disability. First, Provident argues that Dr. Kottle's disability could not begin until he started receiving appropriate and regular treatment with drugs and psychotherapy. Although Provident disputes that such treatment has ever occurred, Dr. Islam's treatment was not clearly called upon by Dr. Kottle on a regular basis until months after he terminated his nephrology practice in March 1996. Therefore, according to Provident, the first purpose of the requirement for appropriate care is to define the commencement date of disability which, in this case, could not be March 1996. We disagree.
*77 As discussed above, the primary determination for disability under the jurisprudence and as quoted in Provident's policy is that the insured is "not able to perform the substantial and material duties of [his] occupation." The evidence substantially supports the determination that in March 1996, Dr. Kottle became unable to perform as a nephrologist. Whether the alleged lack of medical treatment after March of 1996 was attributable to Dr. Kottle's mental condition, the fear of consequences regarding his professional licensing, or embarrassment, such lack of prompt treatment was not shown to be relevant as an automatic and immediate cure to his disability. Certainly, the policy's provision for "care ... appropriate for the condition causing the disability" allows for recognition that in some cases, such as a surgeon's loss of limb, appropriate care has little, if any, relevance to the insured's status as disabled. While this is not such an extreme case of disability, Dr. Kottle's long history of suffering with his condition, his failed attempts at drug therapy, and the necessary exit from his profession in March 1996 do not suggest that a more prompt and extensive regiment of treatment would have quickly ended his disability and allowed re-establishment of a nephrology practice in 1996.
The primary purpose of the policy's requirement for appropriate care, which is correctly argued by Provident, is to insure proper treatment so as to shorten the period of disability. Nevertheless, from our review of the record, the trial court could determine that the medical treatment received by Dr. Kottle through the time of trial was sufficient and appropriate. As shown above in our review of the expert testimony, there was considerable disagreement regarding Dr. Islam's present treatment of Dr. Kottle and whether additional treatment would have allowed Dr. Kottle to return to his occupation as a nephrologist. Regarding the dispute over appropriate drug therapy, Dr. Islam testified that because of Dr. Kottle's thyroid problem, a liver problem and hypertension, treatment with SSRIs was not warranted. The side effects Dr. Kottle experienced with benzodiazepines also prevented their use. Instead, Dr. Islam has provided Dr. Kottle with cognitive therapy. Yet, Dr. Kottle's greatest fear and risk remain connected with the critically ill patients involved with the practice of nephrology and the stresses of the decision making associated with such patients. Although we consider the opposing views raised by Provident's experts to be significant, we nevertheless do not find that the trial court was clearly wrong in its acceptance of Dr. Islam's testimony, and its conclusion that appropriate care has been given.
In summary, what is clear from this disputed policy is that Provident agreed to be obligated for benefits if a physician through a mental disorder loses his ability to continue in a recognized specialty within the scope of his degree and license. We find no manifest error in the trial court's ruling that that event occurred in March 1996, and Provident does not seriously dispute that finding of fact. What is not as clear in Provident's policy is how long its obligation or the period of disability will extend over time since that determination is based upon the measure of the appropriateness and effectiveness of the psychological and medical care. Nevertheless, we likewise must conclude that the trial court's findings regarding the appropriateness of Dr. Islam's medical care and the lack of its effectiveness in restoring Dr. Kottle to an ability to return to his profession as of the time of trial are not unreasonable based upon our review of the record.

II.
Provident's next assignment of error disputes the trial court's finding of fact number 17 which stated that "Provident determined that based upon the information it had been provided, Dr. Kottle was receiving `appropriate care' for his condition." *78 (Emphasis supplied). Provident claims that all evidence submitted by the parties is directly contrary to this conclusion, and that such an error regarding the primary issue of fact in this case interdicts the entire fact finding process of the court and requires an independent de novo review of this court. We disagree, and as indicated above, have applied the manifest error/clearly wrong standard of review.
As an issue in its motion for new trial, Provident called to the trial court's attention finding of fact number 17. That motion primarily reiterated Provident's views concerning the trial court's misconstruction of its policy provisions and the evidence, or lack thereof, regarding Dr. Kottle's treatment. In the last two paragraphs of the motion for new trial, Provident asserted that finding of fact number 17 contained a typographical error which the trial court should correct. The trial court denied the motion for new trial without additional comment.
From our review of the entirety of the trial court's reasons for judgment, we view the finding of fact as a typographical error, particularly in light of the trial court's ruling denying attorney's fees. Additionally, as to the highly disputed issue of appropriate care, the trial court did not rely on any concession by Provident, but instead made four additional findings regarding Dr. Islam's testimony, including finding of fact number 22 which states:
"While having expressed their respective opinions as to what each believes to be the optimum regime or treatment for Dr. Kottle's disorder, which recommendations differ from the course of treatment utilized by Dr. Islam, neither Dr. Ware, Dr. Williams, nor Dr. Seiden have suggested that the course of treatment undertaken by Dr. Islam was either inappropriate or ineffective."
Accordingly, we do not view finding of fact number 17 as indicating that the trial court's ruling on the issue of "appropriate care" was tainted in a manner requiring de novo review. The entirety of the written ruling indicates otherwise, and this assignment of error lacks merit.

III.
A week before the August 1999 trial, Provident filed a Motion in Limine to limit the number of expert witnesses to those previously deposed, which included Dr. Islam, Dr. Hayes, and Dr. Ware for the plaintiff and Dr. Robinson and Dr. Hendler for the defendant. The trial court was then asked to order "that only those psychiatrists previously deposed may testify in this case and that other experts will be reasonably limited." The court signed the order deleting the word "only." At trial, Provident objected to the expert testimony of Dr. Williams as being in violation of the prior order. Nevertheless, the court allowed the testimony of Dr. Williams and Dr. Seiden, and Provident now claims that this testimony was prejudicial.
Under La. C.C.P. art. 1551, the trial court in its discretion may render pretrial orders placing limitations or restrictions on the use of expert testimony. "Such order controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." Id. The judge has much discretion in his determination of whether an order should be modified. Curry v. Johnson, 590 So.2d 1213 (La.App. 1st Cir.1991). If a party objects to the offered testimony, a trial judge has great discretion in deciding whether to receive or refuse the testimony objected to on the grounds of failure to abide by the rules, but any doubt must be resolved in favor of receiving the information. Abdon Callais Boat Rentals, Inc. v. Louisiana Power and Light Company, 555 So.2d 568, 576 (La.App. 1st Cir.1989), writ denied, 558 So.2d 583 (La.1990).
From our review of the trial court's order and the testimony of the two experts, we do not find that the court necessarily violated its own order quoted above, nor caused any prejudice to the defense. *79 The two experts, whose examinations of Dr. Kottle and preparations for trial were limited, provided primarily cumulative expertise. As shown above from the quoted trial court finding of fact number 22, their recommendations for appropriate treatment tended to support the defense position on that key issue. Accordingly, we do not find an abuse of the trial court's discretion in allowing this testimony.

IV.
Answering the appeal, Dr. Kottle argues that the trial court erred in denying his request for penalties and attorney's fees. La. R.S. 22:657(A) provides that claims arising under the terms of health and accident policies issued in this state shall be paid within 30 days of their presentation unless there are just and reasonable grounds justifying delay and that failure to meet these requirements subjects an insurer to penalties and attorney fees. Whether there are just and reasonable grounds is a question of fact which will not be disturbed on appeal unless it is clearly wrong. Morgan v. Golden Rule Insurance Co., 568 So.2d 184 (La.App. 2d Cir. 1990); Nerness v. Christian Fidelity Life Insurance Co., 98-1827 (La.App. 3d Cir.4/21/99), 733 So.2d 146; Savarino v. Blue Cross and Blue Shield of Louisiana Inc., 98-0635 (La.App. 1st Cir.4/1/99), 730 So.2d 1083.
In the case at bar, the trial court denied Dr. Kottle's request for penalties and attorney's fees based upon its finding that "the actions of the defendant, based upon the particular facts and circumstances represented by this case, were not arbitrary or capricious, and the plaintiff is not entitled to recover penalties or attorney fees." Based upon our review of the entire record, we cannot say that the trial court's determination is clearly wrong. The circumstances involving Dr. Kottle's delay in making his claim, the initial lack of medical documentation of Dr. Islam's treatment, and the disputed issue of "appropriate care" support the trial court's conclusion that Provident had reasonable grounds justifying its challenge to the claim in this instance.

Conclusion
For the reasons set forth above, the judgment of the trial court is hereby affirmed. Costs of this appeal are assessed to Provident Life and Accident Insurance Company.
AFFIRMED.
APPLICATION FOR REHEARING
Before NORRIS, C.J., BROWN, WILLIAMS, GASKINS and CARAWAY, JJ.
Rehearing Denied.
NOTES
[1] Dr. Islam's medical records are dated from December 15, 1997. When asked about the discrepancy on cross examination, Dr. Islam replied that he did not keep records from the beginning of treatment.
[2] The assignments of error assert:

The trial court erred in concluding, as a matter of law, that the plaintiff was "totally disabled" as defined in the insurance contact in March 1996, as he was receiving no care whatsoever by a physician.
The trial court erred as a matter of law when it failed to properly apply policy provisions which indicate that the occupation of an insured must be determined "as of the date of the disability." In this case, the plaintiff was not and could not be disabled as of March, 1996 as he was receiving no care whatsoever and the plaintiff's occupation from that date forward was that of a medical school teacher, medical consultant and software developer.
The trial court erred in concluding as a matter of law, that the plaintiff was "receiving care by a physician appropriate for the condition" on the specified dates when the plaintiff not only failed but steadfastly refused to seek appropriate care as is required by the contract.
The trial court erred in failing to grant the defendant's Motion for New Trial in light of the substantial and pervasive legal errors and unfounded factual findings.