METROPOLITAN LIFE INSURANCE COMPANY *vs.* JAMES M.
COTTER.

Middlesex. November 5, 2012. - March 15, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Insurance,* Disability insurance, Construction of policy, Coverage. *Contract,*
Insurance, Unjust enrichment. *Damages,* Restitution. *Restitution. Unjust
Enrichment.*

The plaintiff insurer had no continuing obligation to pay the defendant insured
    benefits under a disability insurance policy requiring the insured to receive
    medical care that was appropriate for the condition causing his disability,
    where the insured did not establish that he had obtained care designed, to
    the extent medically and otherwise reasonable, to ameliorate the condition
    preventing him from returning to his prior occupation. [633-640]
Disability insurance benefits paid to the defendant insured by the plaintiff
    insurer under a unilateral and extracontractual reservation of rights were
    not required to be reimbursed, where the insurer failed to meet its burden
    of establishing that it was unjust for the insured to retain the income
    replacement benefits he received following the insurer's reservation of
    rights. [640-647]

CIVIL ACTION commenced in the Superior Court Department on
September 28, 2007.

The case was heard by *Thomas P. Billings,* J.

The Supreme Judicial Court granted an application for direct
appellate review.

*Praven Shenoy* for the defendant.

*Joseph M. Hamilton (David L. Fine* with him) for the plaintiff.

*Julie Simon Miller,* of the District of Columbia, *& Jeffrey L.
Williams,* for America's Health Insurance Plans, amicus curiae,
submitted a brief.

LENK, J. After paying disability benefits to the defendant,
James M. Cotter, for several years, the plaintiff, Metropolitan
Life Insurance Company (MetLife), determined that Cotter had
failed to satisfy a clause in his "own occupation" disability

insurance policy that required him to receive care by a physician that "is appropriate for the condition causing the disability."[1] Interpreting this clause as requiring Cotter to pursue treatment aimed at returning him to his prior occupation, MetLife advised Cotter that the care he was receiving was not appropriate because it expressly disavowed a return to his prior occupation, and, indeed, was focused on a "return to work in [an] alternate occupation." MetLife informed Cotter that it would continue to pay him benefits under a reservation of rights during the pendency of the litigation, and filed an action in the Superior Court seeking a judgment declaring that it had no continuing obligation to pay benefits to Cotter and reimbursement of benefits it had paid under the unilaterally asserted reservation of rights. Cotter filed counterclaims for violations of G. L. c. 93A and G. L. c. 176D.

Following a jury-waived trial, a Superior Court judge directed the entry of a judgment declaring that, because Cotter was not receiving care "appropriate for the condition causing the disability," MetLife was not required to continue paying him benefits, but declaring also that MetLife was not entitled to restitution of any benefits paid. The judge denied Cotter's counterclaims and his motion for reconsideration. The judge also denied MetLife's motion to amend the judgment. Both parties filed timely notices of appeal, and we granted Cotter's motion for direct appellate review.

We are asked to determine the standard of care required where a disability insurance contract conditions payment of benefits upon receipt of care "appropriate for the condition causing the disability." We must determine also whether, absent a policy provision authorizing such reimbursement, an insurer may obtain reimbursement of benefits paid to an insured who was not receiving the required care.

We conclude that Cotter is not entitled to benefits under the policy, since he is not receiving care designed to enable him to return to his prior occupation, and affirm so much of the judgment as declares that MetLife has no continuing obligation to pay Cotter disability benefits. We conclude also that MetLife is not entitled to reimbursement for benefits it has paid Cotter, and

---

[1] We acknowledge the amicus brief of America's Health Insurance Plans in support of the plaintiff, Metropolitan Life Insurance Company (MetLife).

affirm so much of the judgment as declares that Cotter has no obligation to reimburse MetLife for such benefits, but on grounds other than those relied on by the trial judge. See *Kelly* v. *Avon Tape, Inc.*, 417 Mass. 587, 590 (1994) (appellate court may uphold correct ruling by trial court on ground different from that relied on by trial court).

1. *Background.* We recite the facts found by the trial judge, augmented by facts in the record that the parties do not dispute. In 1995, Cotter purchased an "own occupation" disability insurance policy[2] from an affiliate of MetLife.[3] In September, 2004, Cotter was diagnosed with cancer of the prostate; he underwent a radical prostatectomy in November. Following the surgery, Cotter took a leave of absence from his job as a sales manager for a global broker of electronic components, a position involving long hours in a high-stress, fast-paced environment, which Cotter described as akin to working on the trading floor of a stock exchange.[4] He also filed a claim for disability benefits. Although Cotter returned to work on January 31, 2005, he was unable to perform satisfactorily, in part due to postsurgical

---

[2]An "own occupation" disability policy is distinct from an "any occupation" policy. The latter entitles an insured to disability benefits only when the insured is unable to perform the duties of any occupation. By contrast, an "own occupation" policy entitles an insured to benefits when the insured is unable to perform the duties of the occupation in which he or she was employed when the disability arose. See *United States ex rel. Loughren* v. *Unum Group*, 613 F.3d 300, 303-304 (1st Cir. 2010).

The amicus curiae offers this example: a surgeon with Parkinson's disease may be unable to perform surgery because of ongoing hand tremors despite appropriate medication; the surgeon may, however, be able to teach in a medical school. Being unable to perform surgery, the surgeon would ordinarily receive disability payments under an "own occupation" policy. However, because the surgeon is able to perform the duties of a professor in a medical school, the surgeon may not be eligible to receive benefits under an "any occupation policy."

[3]The policy was issued on March 7, 1995, by New England Mutual Life Insurance Company. MetLife later acquired New England Mutual Life Insurance Company and assumed all obligations under the policy.

[4]Several years prior to his prostate surgery, Cotter had suffered a clogged artery which required a short-term absence from work in order to have a stent inserted; at that time, he was also diagnosed with high blood pressure and high cholesterol. Although the stent required nothing other than annual monitoring, at the time of his prostate surgery, Cotter was being treated with medications for the other conditions.

incontinence, and his employment was terminated two weeks later. He resubmitted his disability claim, this time for disability occasioned by incontinence. In February, 2005,[5] Cotter began receiving disability payments of $5,750 per month, and began treatment for incontinence with two urologists.

As part of his treatment for incontinence, Cotter had been referred to a social worker at the Dana Farber Cancer Institute. Staff there determined that Cotter was not recovering well from the psychological and emotional effects of the surgery and his postsurgery limitations, and recommended that Cotter receive psychological counselling. In September, 2005, Cotter began seeing Dr. Jonathan Weiss, a licensed psychiatrist who was one of the practitioners on a list provided by Cotter's medical insurer.

Cotter's difficulties with incontinence were largely resolved by October, 2005, and one of his urologists notified MetLife that Cotter should be able to return to work by November 5. MetLife advised Cotter by letter that his benefits would be discontinued as of November 30, and suggested that, if he still felt unable to return to work, he submit any additional medical information relative to his claim.

Following receipt of MetLife's letter, Cotter requested that his claim be reopened on the basis of a psychiatric disability. On November 30, Weiss submitted a letter to MetLife stating that Cotter was in "treatment with" him and that Cotter was "not able to return to work at this time for medical reasons." On December 22, 2005, Weiss submitted an "attending physician's statement" requested by Metlife. Weiss reported that Cotter was suffering from "major depression, single episode, severe," with "gradual stabilization anticipated." In February, 2006, Weiss changed his diagnosis to "major depression, recurrent," a diagnosis which has remained unchanged since then. Weiss prescribed a treatment regimen of antidepressant and anti-anxiety medications and "supportive" therapy. While Weiss monitored the impact of the medications, and the dosages of certain medications have changed, his general recommendations

---

[5]Under the terms of the policy, there was a ninety-day waiting period from the date of Cotter's initial claim, in November, 2004, until payments began on February 6, 2005.

of antidepressant and antianxiety medications and supportive therapy have not changed since that time.

Cotter reported to Weiss that he felt he was unable to think or function as he had before, and that he would be unable to perform under the high-stress conditions of his job in the electronics industry. He had difficulty concentrating or handling multiple tasks at one time, a necessity in the electronics broker trading floor environment where he had managed numerous people calling out purchase and sale orders for his approval while the customer, frequently in another country, waited on the telephone. Cotter also discussed these concerns with his then MetLife claims representative. In May, 2006, Cotter obtained a teaching certificate and subsequently began working as a substitute special education teacher in a public high school.[6] In October, 2006, he began serving as an aide to one of the school's students with autism, a position which paid $14,273 per year. MetLife continued to pay the full $5,750 monthly disability benefit during this period.[7]

In the spring of 2007, MetLife assigned Cotter's file to a new

[6]The record suggests that MetLife was aware of Cotter's decision to obtain a teaching certificate as of May, 2006; that Cotter had informed his claims representative of those efforts; and that the claims representative understood Dr. Jonathan Weiss to have indicated that any return to work should be in "baby steps." The record suggests also that Cotter had been advised that the teaching jobs were a possible route back to other employment, and that they would not interfere with his disability claim. The judge made no findings as to any of these issues.

We note that the parties have chosen to include all of the trial exhibits, but only portions of the trial testimony, in the record before us. Morever, although it appears in the record before us, the written report of Dr. Thomas Deters, one of MetLife's experts, was not in evidence, the judge having ordered it struck after trial. The judge noted, however, that Deters testified as to his findings and the reasons therefor, that some of the report was displayed on a chalk, and that Deters was to some extent cross-examined from the report.

[7]Cotter's policy contained a "residual disability" clause entitling Cotter to benefits, up to the full amount of the "total disability" benefit, if he was unable to return to his former occupation but was able to work in a different occupation. The formula used to calculate the "residual disability" amount encompassed the five years of earnings prior to the onset of the disability, and required payment of the "total disability" amount if the difference between current earnings and predisability earnings was greater than seventy-five per cent of predisability earnings.

Because of Cotter's high salary for several years before his disability — in one year he earned over $1 million — Cotter was entitled to the full disability

claims representative who arranged for him to be evaluated by two independent medical examiners (IMEs), Dr. Lawrence S. Fieman, a neuropsychologist, and Dr. Ronald Schouten, a psychiatrist. Fieman reviewed Cotter's medical records, conducted a clinical interview, and administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) test. Fieman concluded that Cotter's clinical profile did not support a diagnosis of major depression, but noted that fatigue and lack of focus "are not addressed" by the MMPI-2. Fiemen opined that Cotter's medications[8] could be contributing to his reported fatigue and anxiety, and that there were "no significant psychological barriers to full time employment."

After interviewing Cotter and reviewing his medical records, Schouten determined that Cotter did "not appear to be suffering from Major Depression or another significant Axis I disorder . . . [but did] evidence symptoms consistent with chronic Adjustment Disorder with mixed depression and anxiety." Schouten credited Cotter's statements that he had difficulty concentrating and focusing on tasks; that stress, pressure, and decisionmaking overwhelm him; and that the multitasking required in his former employment with the brokerage firm would be impossible for him. Schouten's clinical examination supported Cotter's reported difficulties in concentration and inattention, consistent with anxiety and depression. Schouten noted Cotter's concerns about his medical conditions and the financial pressures on his family, but noted also that Cotter found teaching to be lower stress and more rewarding than his

amount under the policy regardless whether MetLife paid him "total disability" or "residual disability" benefits. As the judge noted, MetLife never made an explicit determination regarding which section of the policy was applicable, but all of its letters to Cotter referenced the term "total disability." One of MetLife's claims representatives testified at trial that she never considered a "residual disability" claim because she believed that Cotter initially had filed his claim under the "total disability" section of the policy. The claim forms did not have a section to indicate under which portion of the policy the claim was being made. In any event, the "Physician's Care" language applicable to a "total disability" is identical to that applicable to a "residual disability" (i.e., care by a physician that is "appropriate for the condition causing the disability").

[8]In addition to the medications prescribed by Weiss, Cotter was taking a number of other prescription medications for various physical conditions, including his prostate condition and high blood pressure.

previous occupation. Schouten determined that "Cotter's current symptoms [did] appear to be interfering with his ability to return to work," and that "[a]t present, [his] attentional difficulties would interfere with his ability to handle multiple high-pressure business transactions." Schouten observed also that "the role of his multiple medications," at least five of which could have effects on the central nervous system, "cannot be ruled out."

Schouten concluded,

> "Most importantly, it is clear from examination of Mr. Cotter that he has suffered what can only be described as an existential crisis as a result of his medical problems. This has led him to question the meaning of life, his career choices, and how he has provided for his family. He is now drawn to a vocation that is less stressful and provides him with emotional fulfillment. . . .

> "Mr. Cotter is exhausted and frightened by his medical condition, and fearful of the prospect of trying to return to his old job and not performing adequately. He has little motivation to return to his old position and clearly prefers his current lifestyle. While his current financial situation is much worse than when he was working, it is better than it would be if he were to return to work and [be] fired. . . . At this point, Mr. Cotter does not see [his former] job as being a good fit for him. Mr. Cotter does appear to have accepted the role of being chronically ill."

Schouten recommended an alternate treatment plan, including reassessment of Cotter's medications and weekly psychotherapy with an "emphasis on anxiety management and cognitive behavioral therapy [CBT] and occupational rehabilitation services." Schouten opined, "Assuming the [recommended] suggestions are successful and Mr. Cotter is motivated to return to his old position, [he] could likely return to work within [six] months."

On April 24, 2007, MetLife obtained an updated attending physician's statement from Weiss. In response to the question, posed by MetLife for the first time, "Is return to work a focus of the treatment plan?" Weiss answered "No," and explained, "pursuing alternate employment." Weiss responded similarly in

all subsequent physician statements that he submitted to MetLife. In reply to MetLife's request that Weiss review Fieman's and Schouten's reports, and Schouten's recommendations, Weiss stated in a telephone message, "Mr. Cotter is not motivated to return to his former job. He is pursuing another vocation. That is the focus of our treatment, and the fact that [Schouten wants] him to be motivated does [not] change things."

In his May 21, 2007, attending physician's statement, Weiss replied affirmatively to the question, "Are there secondary conditions impairing your patient's work capacity?" and stated, "Patient [is] not motivated to return to former employment." In response to the question whether return to work was a focus of his treatment, Weiss wrote, "*not* to former employment, yes to different vocation" (emphasis in original). Under "additional remarks," Weiss noted, "Treatment goal focused on *change* in occupation" (emphasis in original).

MetLife sent a letter to Cotter on June 4, 2007, asserting that Weiss did not appear to be willing to pursue Schouten's recommendations, which it believed to be appropriate for Cotter's condition, and that it would be "closely evaluat[ing]" whether Weiss's treatment represented appropriate care under the terms of the policy. On June 20, MetLife also sent a letter to Weiss, stating that it had concluded that Cotter was not interested in returning to his former occupation and that Weiss would not be pursuing Schouten's recommendations. On June 25, Weiss replied:

> "I have reviewed Dr. Schouten's report and discussed it with Mr. Cotter. Mr. Cotter is not motivated or interested in returning to his former occupation. I should note that I also do not recommend he pursue his former employment, as to do so would certainly severely exacerbate his psychiatric and physical conditions, and likely incapacitate him. He is pursuing other, less stressful, employment.
>
> "Dr. Schouten's report describes Mr. Cotter as not motivated to return to his former occupation and I agree with this.
>
> "Dr. Schouten's recommendations apply to a hypotheti-

cal situation, and I do not disagree with his recommendation in that context. However, they do not address the reality of Mr. Cotter's current psychiatric and physical condition, and his change of career goals. These matters are being addressed in Mr. Cotter's current treatment with me."

The judge interpreted this letter "as saying that Cotter would be harmed if he were to return to his old employment *in his then current state*," not that Cotter would be harmed if he were to return to his old employment after receiving appropriate treatment (emphasis in original).

MetLife also had its in-house medical consultant, Dr. John J. Szlyk, review Cotter's file. Szlyk noted that Weiss had not followed any of Schouten's recommendations, and opined that Cotter's "reported lack of motivation to return to his former position may be a matter of choice in this particular situation, as there has been no clinical evidence that [Cotter's] focusing on RTW [return to work] with the support of a comprehensive treatment plan would be detrimental." Szlyk suggested a "physician-to-physician" call to discuss these concerns with Weiss. After MetLife approved this recommendation, Szlyk asked an administrative assistant to schedule the conference call. Weiss answered the telephone call and requested that the assistant relay a message to Szlyk: "I'm really tired of talking about Mr. Cotter, and I have nothing new to say."

MetLife's claims representative noted that Weiss had not disputed the reasonableness or appropriateness of Schouten's recommendations, and had not asserted that they would be harmful to Cotter. On October 1, 2007, MetLife informed Cotter by letter that it had concluded that he was no longer eligible to receive disability benefits:

> "It is our understanding that with the appropriate care, the evidence suggests you would be able to return to your regular occupation. Based upon our discussions with Dr. Weiss, it is apparent that you have chosen not to pursue an avenue of treatment which would allow you to return to your regular occupation. . . . It is your right to [choose] not to pursue the care that would return you to your

occupation. However, in order to continue to receive benefits, it is your obligation under the terms of your policy to obtain curative treatment that is available and which is reasonably expected to allow you to return to work. Therefore, we have concluded that you are no longer eligible for benefits under the terms of your policy."

MetLife stated that it had commenced litigation to determine the parties' rights and obligations under the policy, and that it would continue to pay benefits to Cotter during the course of the litigation, but only "under a reservation of rights," including the right to seek reimbursement of benefit payments.[9]

In February, 2010, MetLife required Cotter to undergo a two-day evaluation by Dr. Thomas J. Deters, a neuropsychologist whom it had retained for that purpose. Deters reviewed all of the previously administered evaluations and reports undertaken at MetLife's request, and administered a number of psychological tests.[10] Deters concluded that Cotter's cognition was in the "average to high average" range and had not been impaired by depression. Disagreeing with Weiss's diagnosis of major depression and with his treatment plan, Deters reported that Cotter suffered from an adjustment disorder which should be treated with CBT and not with psychotropic medications.

While noting that Weiss, who had "a more thorough and longstanding familiarity with [Cotter] than any of the other three" doctors who reported on Cotter's condition to MetLife, had diagnosed Cotter with "major depressive disorder," a diagnosis with which the other three disagreed, the trial judge determined that it was unnecessary to resolve the question. He emphasized that Weiss had not stated that the course of treatment recommended by Schouten would be ineffective or harm-

---

[9]Shortly thereafter, Cotter obtained a position paying $60,000 per year as "director of day supports" in a nonprofit facility providing day care for mentally disabled adults. In this role, Cotter was responsible for supervising three to five managers and approximately forty employees. He was terminated from that position after two years of employment for failure to maintain adequate records, and he was unemployed at the time of trial. Cotter asserted at trial that his difficulties in concentrating contributed significantly to his inability to maintain proper records.

[10]Deters declined to disclose details of any of the tests he administered, citing confidentiality requirements.

ful to Cotter or to someone suffering from major depression. The judge concluded that Cotter was not receiving appropriate care under the terms of the policy, and therefore that he was ineligible for benefits.

2. *Discussion.* Disability insurance policies often require the insured to receive some level of medical care in order to be eligible for benefits. See *Heller* v. *Equitable Life Assur. Soc'y*, 833 F.2d 1253, 1257 (7th Cir. 1987) (requiring physician's care serves purpose of showing that insured is in fact disabled, is not malingering, and is not making fraudulent claim). Care provisions also "serve the additional purpose of minimizing the insurer's loss under the policy in cases in which the insured's disability can benefit from a physician's care" by encouraging "insureds to seek prompt medical treatment for their disabling conditions," potentially avoiding "further deterioration of a disabling condition or speed[ing] the insured's recovery," and thereby "protecting the insurer from unnecessary harm." *Stinnett* v. *Northwestern Mut. Life Ins. Co.*, 101 F. Supp. 2d 720, 725-726 (S.D. Ind. 2000). See 1 G. Couch, Insurance, § 146:23 (3d ed. 1998).

Care provisions generally fall into two types,[11] either requiring care that is "regular" or care that is "appropriate."[12] See, e.g., *Provident Life & Acc. Ins. Co.* v. *Van Gemert*, 262 F. Supp. 2d 1047, 1049-1050 (C.D. Cal. 2000), and cases cited. Regular care is care that is provided on an ongoing basis by a licensed practitioner. See *Heller* v. *Equitable Life Assur. Soc'y, supra* (declining to interpret "regular care and attendance" by physi-

---

[11]The care provision at issue here requires both types of care. It requires "the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability."

[12]Because " '[r]egular' care is largely quantitative, while 'appropriate' care is largely qualitative," Symposium, Find the Catch in the Contract, 45 Trial 10, 30 (2009), the type of care required can be determinative of an entitlement to benefits under a disability claim. See *Provident Life & Acc. Ins. Co.* v. *Van Gemert*, 262 F. Supp. 2d 1047, 1050-1052 (C.D. Cal. 2003) (insured may be required to undergo more extensive care under "care and attendance" [regular care] clause). See also *Lustenberger* v. *Boston Cas. Co.*, 300 Mass. 130, 135-137 (1938) ("regular care" requires "regular and continuous treatment" which may be of varying durations and frequency; "[t]he required care and its regularity must of necessity depend upon the nature of the injury or illness and the progress of the patient").

cian as meaning care appropriate for insured's condition, and concluding that "regular care" means no more than regular monitoring of insured by physician). See also *Bakal* v. *Paul Revere Life Ins. Co.*, 576 F. Supp. 2d 889, 900 (N.D. Ill. 2008), quoting *Heller* v. *Equitable Life Assur. Soc'y*, *supra* ("regular care" of physician has "generally been construed to mean 'the insured is obligated to periodically consult and be examined by his or her treating physician at intervals to be determined by the physician' ").

Appropriate care is care that is "appropriate for" the disabling condition. See *Provident Life & Acc. Ins. Co.* v. *Henry*, 106 F. Supp. 2d 1002, 1004 (C.D. Cal. 2000) ("appropriate" care "would be determined objectively as the treatment a patient would make a reasonable decision to accept after duly considering the opinions of medical professionals"). See also *Provident Life & Acc. Ins. Co.* v. *Van Gemert*, *supra* at 1049-1057 (disability policy requiring insured to be receiving "care by a physician which is appropriate for the condition causing the disability . . . cannot reflect an intent of the parties that the insurer will be obligated to pay benefits even if the insured stubbornly refuses the only appropriate 'care' recommended").

a. *Appropriate care clause in Cotter's policy.* Cotter's policy states that, in order to be entitled to the payment of benefits, "You (i.e., 'the insured')" must be "unable to perform the material and substantial duties of Your Occupation"[13] and must be "receiving Physician's Care." "Physician's Care" is defined as "the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability." See note 11, *supra*. MetLife maintains that Cotter is ineligible for benefits because he failed to obtain, as required under the terms of his policy, care "appropriate for the condition causing the disability."

The interpretation of an insurance contract is a question of law, *Boston Gas Co.* v. *Century Indem. Co.*, 454 Mass. 337, 355 (2009), which we review de novo. *Rhodes* v. *AIG Domestic Claims, Inc.*, 461 Mass. 486, 495 (2012).

"[I]nterpretation of language in an insurance contract 'is no

---

[13]"Your Occupation" is defined as "the occupation or occupations in which You are regularly engaged at the time Disability begins."

different from the interpretation of any other contract, and we must construe the words of the policy in their usual and ordinary sense.' " *Metropolitan Prop. & Cas. Ins. Co.* v. *Morrison,* 460 Mass. 352, 362 (2011), quoting *Boston Gas Co.* v. *Century Indem. Co., supra.* "Every word in an insurance contract 'must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable.' " *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London,* 449 Mass. 621, 628 (2007), quoting *Jacobs* v. *United States Fid. & Guar. Co.,* 417 Mass. 75, 77 (1994). If the meaning of the contract language is unclear, we "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Hazen Paper Co.* v. *United States Fid. & Guar. Co.,* 407 Mass. 689, 700 (1990). "Any ambiguities in the language of the contract are interpreted against the insurer who used them and in favor of the insured." *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London, supra.*

Since we have not previously had occasion to construe the requirement that care be "appropriate for the condition causing the disability," we turn for guidance to how such clauses have been interpreted in other jurisdictions. As discussed below, in construing language virtually identical to the language in Cotter's disability insurance policy, courts in other jurisdictions have reached significantly differing conclusions. Decisions generally fall under two lines of reasoning, treating the phrase as requiring care that either meets prevailing medical standards or is designed specifically to enable a return to the insured's prior occupation, even when other medically appropriate treatments are available. A few courts have applied a requirement that is substantially similar to the standard for "regular care."

Courts following the first line of reasoning interpret care "appropriate for the condition causing the disability" to mean care appropriate under prevailing medical standards. In *Postma* v. *Paul Revere Life Ins. Co.,* 223 F.3d 533, 541-542 (7th Cir. 2000), the United States Court of Appeals for the Seventh Circuit considered a disability insurance policy where "doctor's care" was defined as "the regular and personal care of a [d]octor which under prevailing medical standards, is appropriate for the condition causing the disability." It concluded that the insured,

who had begun working at another job after a back injury, was entitled to residual disability benefits. The insured's physician stated that he provided "appropriate doctor's care" for the back injury. Because the insurer did not provide evidence to show that the physician's care did not meet prevailing medical standards, the court held that the insured was under a "doctor's care" according to the terms of the policy. See, e.g., *Eichacker* v. *Paul Revere Life Ins. Co.* 354 F.3d 1142, 1146-1148 (9th Cir. 2004) (denying insurer's motion for summary judgment and concluding that treatment by plastic surgeon for injuries suffered in car accident would be care "appropriate for the condition causing the disability" where insured claimed disability due to depression after his facial injuries had healed, if jury were to determine that insured's depression was caused by insured's facial injuries); *Brosnan* v. *Provident Life & Acc. Ins. Co.*, 31 F. Supp. 2d 460, 463-464 & n.3 (E.D. Pa. 1998) (concluding reasonable juror could conclude care appropriate where former anesthesiologist, who had begun practice of family medicine rather than return to high-stress operating room after treatment for alcoholism, was receiving weekly therapy sessions for alcoholism, anxiety, and depression rather than "undergoing symptom focused therapy or taking medicine to control his anxiety").

At least one court has concluded that care "appropriate for the condition causing the disability" simply means care received from a licensed physician acting within the scope of his or her license that is "necessary and causally related to the condition forming the basis of the disability claim," and that an inquiry into the prevailing standard of care, or any "qualitative" evaluation of the care, has no bearing on a determination of eligibility for benefits. See *Morinelli* v. *Provident Life & Acc. Ins. Co.*, 242 Mich. App. 255, 262-264 (2000).[14]

One court has imposed a standard of reasonableness and

---

[14]Further, in the medical standard line of cases, some courts have held that "appropriate care" need not include a requirement that the care meet prevailing medical standards, and may even encompass care by nonphysicians and substandard care. See e.g., *Sebastian* v. *Provident Life & Acc. Ins. Co.*, 73 F. Supp. 2d 521, 529-531 (D. Md. 1999) (concluding reasonable juror could find care was "appropriate" where patient with bipolar disorder was misdiagnosed by psychiatrist and treated with antidepressant medications); Stamm *vs.*

concluded that an insured was required to follow treatment recommendations designed to return the insured to work "only if such care reflected the only treatment option a reasonably prudent person would choose." *Provident Life & Acc. Ins. Co.* v. *Van Gemert*, 262 F. Supp. 2d 1047, 1052 (C.D. Cal. 2000). "Where a patient is presented with more than one 'reasonable' treatment option, or where a treating physician is ambivalent about the risks or remedial value of surgery, it would seem sufficient . . . that the patient has considered and elected not to pursue such a course." *Id.*

Other courts, by contrast, have concluded that care "appropriate for the condition causing the disability" implies an affirmative duty on the part of the insured to "seek and accept appropriate care for his disabling condition," i.e., care designed to enable the insured to return to his former employment. See, e.g., *Mack* v. *Unum Life Ins. Co.*, 471 F. Supp. 2d 1285, 1290-1291 (S.D. Fla. 2007); *Provident Life & Acc. Ins. Co.* v. *Henry*, 106 F. Supp. 2d 1002, 1004-1005 (C.D. Cal. 2000); Paul Revere Life Ins. Co. *vs.* DiBari, U.S. Dist. Ct., No. 3:08CV1795(JBA) (D. Conn. Nov 19, 2010); Doe *vs.* Provident Life & Acc. Ins. Co., U.S. Dist. Ct., No. Civ.A.96-3951 (E.D. Pa. Dec. 30, 1997).

We are persuaded by the reasoning of those courts that have concluded that an appropriate care clause imposes a duty on the insured to seek and accept care appropriate for his or her "disabling condition." Whether care is "appropriate" turns on the meaning of the clause "the condition causing the disability." That clause is to be read in light of the insurance policy as a whole, where "total disability" is defined as the insured's inability to perform "the material and substantial duties" of the occupation in which he or she was engaged at the time the disability began. An objectively reasonable insured, see *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, *supra*, would accordingly understand "the condition causing the disability" to mean the condition preventing the insured from returning to his prior occupation. It follows that care is "appropriate for the condition causing the disability" where, to the extent medically

Provident Life & Acc. Ins. Co., U.S. Dist. Ct., No. 96C3311 (N.D. Ill. Sept. 2, 1998) (reliance on chiropractor for diagnosis and treatment of stress-related disorder "appropriate care" under disability policy).

and otherwise reasonable, it seeks to ameliorate the condition preventing the insured from returning to his or her prior occupation.

Such a reading comports with the purpose of the appropriate care clause "to insure proper treatment so as to shorten the period of disability." *Kottle* v. *Provident Life & Acc. Ins. Co.,* 775 So. 2d 64, 77 (La. App. 2 Cir. 2000). See, e.g., *Mack* v. *Unum Life Ins. Co., supra* at 1289, quoting *Mutual Life Ins. Co.* v. *Ellison,* 223 F.2d 686, 688-691, 694 (5th Cir.), cert. denied, 350 U.S. 845 (1955) (appropriate care requires insured to seek and accept care that is appropriate for disabling condition as determined by treating physician; insured has duty " 'to avail himself of all reasonable means and remedies to remove' any impediment that purportedly causes a totally disabling condition"); *Reznick* v. *Provident Life & Acc. Ins. Co.,* 364 F. Supp. 2d 635, 639-640 (E.D. Mich. 2005), aff'd, 181 Fed. Appx. 531 (6th Cir. 2006) (where dosage of prescribed psychiatric medications was below "typical therapeutic level," treating physician recommended quarterly visits rather than standard "intensive weekly psychotherapy," and insured was in any event not compliant with physician's recommendations, insured was not receiving appropriate care); *Provident Life & Acc. Ins. Co.* v. *Henry, supra* (question for jury whether surgery for carpal tunnel syndrome rejected by insured was appropriate care where more conservative treatment had failed and surgery was low risk, with potential to allow insured to return to work).

Cotter maintains that the requirement that he obtain care "appropriate for the condition causing the disability" only requires him to seek care that is generally appropriate to treat his medical disability, regardless whether such care will enable him to return to his prior occupation. Cotter contends that the care he received from Weiss, a psychiatrist, was generally appropriate for treating his psychiatric disability, and thus satisfied the appropriate care clause. Although Cotter's reading is of some appeal when considering the clause in isolation, such a reading does not comport with the reasonable expectations of the parties in the "own occupation" policy as whole, see *Finn* v. *National Union Fire Ins. Co.,* 452 Mass. 690, 695 (2008), nor with the liability-limiting purpose of the appropriate care clause. See

*Provident Life & Acc. Ins. Co.* v. *Henry*, *supra* at 1004. Cotter's reading would permit an insured to collect disability benefits even where he rejected undisputedly safe, noninvasive, and effective care that would permit him to return to his prior occupation, so long as the care he chose was generally medically appropriate for his underlying condition. We reject such a construction.

To be sure, care that is generally medically appropriate for a particular condition will often necessarily also be care that seeks to ameliorate the impediments preventing an insured from returning to his or her prior occupation. In some cases, however, a physician may prescribe a course of treatment that, while medically appropriate, will not enable a recovery that allows the insured to return to his or her former occupation. See, e.g., Paul Revere Life Ins. Co. *vs*. DiBari, *supra*. Where an insured can show that such a course of treatment is reasonable, the care may be considered appropriate. Absent an explicit showing why such a course of treatment is reasonable, however, care expressly disavowing the insured's return to his or her prior occupation will not satisfy the requirement of "care appropriate to the condition causing the disability" in a disability insurance policy defining "total disability" as being "unable to perform the material and substantial duties" of "the occupation . . . in which [the insured was] regularly engaged at the time [the disability began]."

Here, Weiss consistently and unambiguously informed MetLife that it was not the goal of Cotter's treatment to address and alleviate the psychiatric disability to the extent necessary to allow Cotter to return to his prior occupation. Rather, citing Cotter's "change of career goals" and lack of "motivation," Weiss directed Cotter's treatment toward adopting a less stressful, alternate occupation. Nowhere in the evidence presented did Weiss dispute the conclusions of MetLife's experts that, given a different course of treatment and motivation to do so, Cotter likely could return to his former occupation, or that such treatment posed any risk to Cotter's mental or physical well-being.

It was Cotter's burden as the insured to prove that his claim was covered by the policy. See *Lustenberger* v. *Boston Cas. Co.*, 300 Mass. 130, 135 (1938). As the judge observed, nothing

in Weiss's statements indicated that Cotter would be harmed by the cognitive behavioral therapy recommended by Schouten. However, Weiss refused to participate in the conference call designed to clarify his treatment and recommendations, or to elaborate on his recommendations in any of his reports. Weiss did not testify at trial, and his deposition testimony was not available.[15] The judge construed Weiss's letter stating, "I also do not recommend [Cotter] pursue his former employment, as to do so would certainly severely exacerbate his psychiatric and physical conditions, and likely incapacitate him," as meaning "that Cotter would be harmed if he were to return to his old employment *in his then current state*" rather than returning after having received CBT (emphasis in original).

Had Weiss testified, it could readily have been ascertained whether he intended this inferred limitation as to Cotter's "then current state." Cf. *Pralutsky* v. *Metropolitan Life Ins. Co.*, 435 F.3d 833, 840 (8th Cir.), cert. denied, 549 U.S. 887 (2006). The failure to introduce Weiss's or other pertinent testimony in this regard, however, resulted in Cotter's inability to refute MetLife's contention that its recommendations would not have been harmful to Cotter, and therefore that Weiss's treatment of Cotter was not appropriate. Contrast *Postma* v. *Paul Revere Life Ins. Co.*, 223 F.3d 533, 541-542 (7th Cir. 2000) (where physician testified that he provided appropriate care, and insurer, who disputed care was appropriate for condition causing disability, did not provide evidence to show care did not meet prevailing medical standards, insured established that care was appropriate).

Because Cotter failed to establish that he was receiving appropriate care as required by the terms of the policy,[16] the trial judge declared correctly that MetLife has no continuing obligation to pay Cotter disability benefits.[17]

b. *Reimbursement under reservation of rights.* By the time of

---

[15]By contrast, MetLife presented two expert witnesses, Schouten and Deters.

[16]Our reasoning as to Cotter's ineligibility for "total disability" benefits applies equally to any claim for "residual disability" benefits, as the policy requires, in identical language, that the insured receive appropriate care in order to be eligible for residual benefits. See note 7, *supra*.

[17]Because MetLife was correct in determining that Cotter was ineligible for benefits, Cotter's counterclaims alleging violations of G. L. c. 93A and G. L.

trial in December, 2010, MetLife had paid Cotter a total of $224,250 in monthly benefits over the approximately three-year period following its unilateral assertion of an extracontractual reservation of its rights.[18] MetLife maintains that it is entitled to restitution of all benefits it paid Cotter "which would not have been due had he received appropriate care." Relying on *Medical Malpractice Joint Underwriting Ass'n* v. *Goldberg*, 425 Mass. 46 (1997) (*Goldberg*), the judge concluded that MetLife was not entitled to reimbursement, since the policy did not contain any provision authorizing a reservation of rights, and since Cotter neither expressed agreement with MetLife's position that he was not entitled to benefits nor agreed to reimburse MetLife should its position prevail.

Ordinarily, a claim of unjust enrichment will not lie "where there is a valid contract that defines the obligations of the parties." *Boston Med. Ctr. Corp.* v. *Sec'y of the Executive Office of Health & Human Servs.*, 463 Mass. 447, 467 (2012), citing Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011). However, in circumstances where one party to a contract demands performance from the other that is not due under the terms of the contract, the other party may "render such performance under protest or with reservation of rights, preserving a claim in restitution to recover the value of the benefit conferred in excess of the recipient's contractual entitlement." Restatement (Third) of Restitution and Unjust Enrichment § 35(1) (2011). We have not previously had occasion to determine if an insurer may seek

---

c. 176D properly were denied. To the extent that we are able to construe the claim, we conclude that there was no error in the judge's decision denying Cotter's claim that MetLife acted deceptively in providing him with Schouten's report, but not providing the questions posed by MetLife that served as the basis for some of Schouten's responses.

[18]In its October 1, 2007, letter informing Cotter that it had determined he was no longer entitled to benefits, MetLife stated:

> "Rather than terminate your benefits, while the lawsuit is pending, we will continue to pay you under a reservation of all rights and defenses until further order or decision by the [c]ourt. . . .

> "Pursuant to our reservation of rights, we will seek reimbursement of all benefits paid to you while the lawsuit is pending, in the event that it is determined that we do not have liability on your claim."

reimbursement of disability insurance benefits paid to an insured under a unilateral and extracontractual reservation of rights.[19]

In the context of liability insurance policies, an insurer may undertake the defense of an insured pursuant to a unilateral reservation of rights and such a defense will "not estop the insurer from subsequently disclaiming liability because the insured had been put on notice of such possible disclaimer and could . . . take necessary steps to protect its rights." *Herbert A. Sullivan, Inc.* v. *Utica Mut. Ins. Co.*, 439 Mass. 387, 406 (2003). In *Goldberg, supra* at 58-59, we concluded that an insurer may seek reimbursement for an amount paid to settle a tort action, but "only if the insured has agreed that the insurer may commit the [insurer's][20] own funds to a reasonable settlement with the right later to seek reimbursement from the insured, or if the insurer secures specific authority to reach a particular settlement which the insured agrees to pay."[21] However, we noted that reimbursement would be inappropriate where, as in the circumstances in that case, an insurer entered into a settlement "to

[19]In *French King Realty Inc.* v. *Interstate Fire & Cas. Co.*, 79 Mass. App. Ct. 653, 668-669 (2011), the Appeals Court held that an insurer was entitled to reimbursement of an erroneously made advance payment where there was no coverage under the terms of a fire insurance policy and the insured did not change its position in detrimental reliance on the payment, even though the policy had no provision permitting a reservation of rights.

[20]The term "insured's" appears here in the text of *Medical Malpractice Joint Underwriting Ass'n* v. *Goldberg*, 425 Mass. 46, 58 (1997); this is a typographical error.

[21]We have not addressed whether an insurer may seek reimbursement for the costs of a defense undertaken pursuant to a unilateral reservation of rights. We note that other jurisdictions are split as to the validity of such claims. See *Perdue Farms, Inc.* v. *Travelers Cas. & Sur. Co.*, 448 F.3d 252, 258 (4th Cir. 2006), and cases cited ("jurisdictions differ on the soundness of an insurer's right to reimbursement of defense costs").

Based on the theory that insurers are in the business of analyzing and allocating risk, and thus in a better position to do so, courts in some jurisdictions have declined to allow liability insurers to bring reimbursement claims for the costs of defense. See *Texas Ass'n of Counties County Gov't Risk Mgt. Pool* v. *Matagorda County*, 52 S.W.3d 128, 135 (Tex. 2000). See, e.g., *Excess Underwriters at Lloyd's, London* v. *Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 45-47 (Tex. 2008) ("imposing an extra-contractual reimbursement obligation places the insured in a highly untenable position"); *United States Fid.* v. *United States Sports Specialty*, 270 P.3d 464, 470-471 (Utah 2012) ("The right of an insurer to recover reimbursement from its insured distorts the allocation of risk unless it has been specifically bargained for").

protect its interests [by limiting its potential exposure to a G. L. c. 93A claim], and not the interests of [the insured]." *Id.* at 60-61.

The rationale underlying our decision in the liability insurance context, however, reflects a recognition that the liability insurer's "duty to defend is independent from, and broader than, its duty to indemnify." *Metropolitan Prop. & Cas. Ins. Co.* v. *Morrison*, 460 Mass. 352, 357 (2011), quoting *A.W. Chesterton Co.* v. *Massachusetts Insurers Insolvency Fund*, 445 Mass. 502, 527 (2005). Much of our concern in *Goldberg, supra*, then, centered on the insured's lack of involvement with or consent to the settlement. This situation is unlikely to arise in the disability insurance context, where an insured who is the recipient of disability benefits ordinarily cannot claim to be removed from the payment process.

Our decision in *Goldberg, supra*, does not itself foreclose MetLife's claim for reimbursement under a reservation of rights. We therefore consider whether MetLife has established an entitlement to reimbursement under the equitable principles of unjust enrichment. Cf. *Massachustts Cas. Ins. Co.* v. *Rosen*, 953 F. Supp. 311, 315 (C.D. Cal. 1996) (acknowledging insurer's right to seek reimbursement of disability benefit payments made pursuant to a unilateral reservation of rights).

"A quasi contract or a contract implied in law is an obligation created by law 'for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent.' " *Salamon* v. *Terra*, 394 Mass. 857, 859 (1985), quoting 1 A. Corbin, Contracts § 19 (1963). "Restitution is an equitable remedy by which a person who has been unjustly enriched at the expense of another is required to repay the injured party." *Keller* v. *O'Brien*, 425 Mass. 774, 778 (1997), citing *Salamon* v. *Terra, supra*. "The fact that a person has benefited from another 'is not of itself sufficient to require the other to make restitution therefor.' . . . Restitution is appropriate 'only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for [one] to retain it.' " *Keller* v. *O'Brien, supra*, quoting Restatement of Restitution § 1 comment c (1937), and citing *National Shawmut Bank* v. *Fidelity Mut. Life Ins. Co.*, 318 Mass. 142, 146 (1945).

A determination of unjust enrichment is one in which "[c]onsiderations of equity and morality play a large part." *Salamon* v. *Terra, supra.* A plaintiff asserting a claim for unjust enrichment must establish not only that the defendant received a benefit, but also that such a benefit was unjust, "a quality that turns on the reasonable expectations of the parties." *Global Investors Agent Corp.* v. *National Fire Ins. Co.,* 76 Mass. App. Ct. 812, 826 (2010), quoting *Community Builders, Inc.* v. *Indian Motorcycle Assocs., Inc.,* 44 Mass. App. Ct. 537, 560 (1998). "The injustice of the enrichment or detriment in quasi-contract equates with the defeat of someone's reasonable expectations." *Salamon* v. *Terra, supra.* The party seeking restitution has the burden of proving its entitlement thereto. *J.A. Sullivan Corp.* v. *Commonwealth,* 397 Mass. 789, 796 (1986). *Hayeck Bldg. & Realty Co.* v. *Turcotte,* 361 Mass. 785, 789 (1972), citing *Andre* v. *Maguire,* 305 Mass. 515, 516 (1940).

We have allowed claims for restitution in circumstances involving fraud, bad faith, violation of a trust, or breach of a duty; in "business torts" such as unfair competition and claims for infringment of trademark or copyright; and in some circumstances, as here, in disputes arising from quasicontractual relations. See *Keller* v. *O'Brien, supra* at 778-779. In order to prevail on its claim for reimbursement of disability insurance benefits it paid to Cotter under a reservation of rights, MetLife must establish not only that Cotter received a benefit, which is not disputed, but also that such a benefit was unjust. MetLife asserted in its complaint that it was "entitled to a return of any benefits paid to Mr. Cotter which would not have been due had he received appropriate care." It sought a judgment awarding it "restitution of all disability benefits paid to Mr. Cotter under the Policy from the point in time that Mr. Cotter would have been able to return to perform the substantial duties of his occupation if he had received appropriate medical care for his allegedly disabling condition."

MetLife, however, did little more than establish that it made timely benefit payments under an extracontractual and unilateral reservation of rights. It did not establish that Cotter's receipt of income replacement benefits was unjust. Indeed, it did not even establish the factual predicate for its claim that it was entitled to

a return of any benefits paid "which would not have been due had he received appropriate care." MetLife's experts, for example, did not opine to a reasonable degree of medical certainty that, if their recommendations had been undertaken, Cotter would ever be able to return to his former occupation. Nor did MetLife otherwise establish by a preponderance of the evidence that there was a point in time at which Cotter would have been able to return to his prior occupation had he received the "appropriate care" the insurer recommended.[22]

The purpose of disability insurance benefits is for an insured to receive income replacement payments upon satisfying the policy conditions. It is likely often to be the case that such payments will be the insured's only source of income. Even in instances where an insurer "in good faith denies a claim of coverage on the basis of a plausible interpretation of the insurance policy," *Lumbermen's Mut. Cas. Co.* v. *Offices Unlimited, Inc.*, 419 Mass. 462, 468 (1995),[23] the insured is put to something of a Hobson's choice where benefits are paid pursuant to the insurer's unilateral reservation of rights. He can either accept the benefits at the risk of incurring substantial, if not crip-

---

[22]MetLife did not introduce any evidence that the course of treatment recommended by Schouten, whose treatment plan MetLife identified as "appropriate," would have enabled Cotter to return to his prior occupation. While Schouten opined that, "[a]ssuming the [recommended] suggestions are successful and Mr. Cotter is motivated to return to his old position, [he] could likely return to work within [six] months," he also stated that the cause and extent of Cotter's attentional difficulties were unknown and awaited evaluation, and that the likelihood of success in treatment was undefined and uncertain. Further, MetLife's experts agreed neither on whether Cotter should be taking antidepressant medications nor on whether those medications were contributing to his difficulties in functioning. Nor did MetLife's experts agree on the type of psychotherapy that Cotter should be receiving to enable him to return to his prior occupation, or its likelihood of success; they all opined, however, that Weiss's "supportive" therapy was not the correct approach. As to the likelihood of success of his recommended treatment, Schouten opined only that, "[i]f motivated to return to his former occupation, and if the cause of his attentional problems can be identified and addressed, Mr. Cotter should be able to return to work."

[23]While MetLife's interpretation of what constitutes "appropriate care" under the policy was certainly a plausible interpretation, it was not the only plausible interpretation, and the state of the law was not well established on the point when MetLife made its coverage determination. Even on MetLife's view of the meaning of the appropriate care clause, there was uncertainty whether coverage was available in the particular circumstances here.

pling, liability should reimbursement be awarded the insurer, see *Sprague* v. *Equifax, Inc.*, 166 Cal. App. 3d 1012, 1031 (Cal. Ct. App. 1985) ("A debt is as much an economic loss as the removal of payments, particularly where the debtor is disabled and without income to make repayment"), or decline the benefits which may be his only source of income while engaging in costly coverage litigation with the insurer. Given this, absent some indication of fraud on the part of the insured, a deliberate failure by the insured to comply with a treating physician's recommendation, or conduct of comparable gravity, an insurer bears a heavy burden when it seeks to show that the insured's retention of disability benefits was unjust. MetLife has not met that burden here.

MetLife's own experts testified that Weiss's treatment of Cotter met the standard of care for a patient in his condition,[24] and there is no suggestion that Cotter did not comply fully with Weiss's treatment plan. By the time that MetLife made its determination that Cotter was not receiving appropriate care, and began paying benefits under its unilateral reservation of rights, Cotter had been under Weiss's care for approximately two years, and had undertaken substantial steps towards the treatment goal of a less stressful occupation, including obtaining a teaching certificate. While the judge made no findings on this point, the record suggests that MetLife was aware of, and apparently did not at the time contest, Cotter's efforts to obtain the teaching certificate and to seek teaching positions, approximately one and one-half years before it determined that the care was not appropriate. At no point did Weiss express agreement with MetLife's determination that his recommended treatment was not appropriate under the policy, nor did Cotter express agreement with MetLife's assessment that Weiss's treatment protocol was not appropriate care. As earlier noted, MetLife does not establish that, had Cotter followed its recommended

---

[24]MetLife's experts did not agree with Weiss's diagnosis that Cotter suffered from major depression, but did agree that Cotter showed symptoms consistent with an "adjustment disorder with mixed depression and anxiety" or with an "adjustment disorder." Schouten testified that Cotter met four of the eight criteria for major depression, and that, had he determined that Cotter met a fifth criterion, he would have diagnosed Cotter with major depression.

treatment plan, he would more likely than not be able to return to his prior occupation.

In sum, MetLife has failed to meet its burden of establishing that it was unjust for Cotter to retain the income replacement benefits he received following the insurer's unilateral reservation of rights. The judge concluded correctly that MetLife was not entitled to reimbursement.

*Judgment affirmed.*